**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                                       :
UNITED STATES OF AMERICA                               :
                                                       :
              v.                                       :
                                                       :         Case No. 16-cr-00776 (VEC)
ALAIN KALOYEROS, et al.,                               :
                                                       :
              Defendants.                              :
                                                       :
-------------------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT ALAIN KALOYEROS'**
**MOTION FOR SUPPRESSION OF SEARCH WARRANT EVIDENCE**

Michael C. Miller
Jeffrey A. Novack
Katherine M. Dubyak
David B. Hirsch
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900

*Counsel for Alain Kaloyeros*

Dated: May 19, 2017

Defendant Alain Kaloyeros ("Dr. Kaloyeros") respectfully submits this memorandum of law, together with the Declaration of Michael C. Miller ("Miller Decl."), in support of his motion for suppression of search warrant evidence.

## I.   INTRODUCTION

Dr. Kaloyeros' Motion to Dismiss demonstrates that this case is fueled by the Government's desire to find wrongdoing where none exists.  Unsurprisingly, that same improper motivation is reflected in two search warrants issued by the U.S. Attorney's Office for the Southern District of New York (the "USAO").  It is also present in a search warrant issued by the New York Attorney General ("NYAG"), the illegal fruits of which were turned over to the USAO.

These search warrants present a uniquely problematic combination.  On one hand, they are premised entirely on rank speculation of wrongdoing; indeed, the first federal search warrant is based almost entirely on a typographical error in a request for proposal ("RFP") which was promptly corrected.  On the other hand, they seek nearly complete and unfettered access to Dr. Kaloyeros' personal e-mails and cellular phone.  The fruits of these search warrants must be precluded because:  (1) the search warrants were issued without probable cause; (2) the search warrants are overbroad and devoid of the requisite particularity; and (3) the good faith exception for search warrants does not apply because the warrants contain materially misleading omissions and are grossly deficient on their face.

## II.   BACKGROUND

We detail each of the search warrants at issue below.

A.     The December 8, 2015 Search Warrant

On December 8, 2015, the USAO issued a search warrant to search the g-mail accounts of Dr. Kaloyeros and Defendant Louis Ciminelli.[1]  The search warrant sought the entirety of Dr. Kaloyeros' g-mail account from December 1, 2012 to the present and authorized the Government to review the seized materials with no limitations.  Specifically, it requested:

- "All emails sent to or from, stored in draft form in, or otherwise associated with the Subject Accounts, including all message content, attachments, and header information . . . for the time period between December 1, 2012 to the present";

- All address book and contact list information;

- All subscriber and payment information;

- All correspondence with the subscriber or others associated with the account "including complaints, inquiries, or other contacts with support services and records of action taken"; and

- Preserved copies of any of the above categories of information.

Ex. A Attach., § II.

The affidavit in support of the search warrant (the "December 2015 Warrant Affidavit")[2] claimed that there was probable cause to believe that these accounts contained evidence of violations of Title 18 U.S.C. Sections 666 (prohibiting bribery in programs receiving federal funds), 1341 (mail fraud), 1343 (wire fraud), 1346 (honest services fraud), and 1349 (mail and wire fraud conspiracy).  Ex. B, ¶ 3.

In support, the December 2015 Warrant Affidavit states in substance that:

---

[1]     A copy of the search warrant is attached to the Miller Decl. as Exhibit A.

[2]     A copy of the affidavit in December 2015 Warrant Affidavit is attached to the Miller Decl. as Exhibit B.

- Dr. Kaloyeros was a board member of Fort Schuyler Management Corporation ("FSMC"), a New York state not-for-profit corporation.  *Id.* ¶¶ 8, 11.  Mr. Ciminelli was the chief executive officer of LPCiminelli.  *Id.* ¶ 11.

- On or about September 9, 2013, Dr. Kaloyeros e-mailed Mr. Ciminelli "relevant sections" of a draft RFP.  *Id*. ¶ 19.  He noted that FSMC would "need to replace Syracuse with Buffalo and fine tune the developer requirements to fit" and that "hopefully [it] should give [Mr. Ciminelli] a sense [of] where [FSMC is] going with [it]."  *Id.*  Dr. Kaloyeros asked for Mr. Ciminelli's "thoughts."  *Id.*  The draft contained a provision calling for "over 15 year [sic] of proven experience."  *Id.*

- The draft RFP, while sent to Mr. Ciminelli in Buffalo, had been prepared with a project in Syracuse in mind.  Specifically, the draft RFP noted that FSMC was seeking a "Request for Proposal For a Strategic Research, Technology Outreach, Business Development, Manufacturing, And Education and Training Partnership With a Qualified Local Developer in the Greater Syracuse Area."  *Id*. at 19(b).

- Dr. Kaloyeros' September 9, 2013 e-mail was sent from his g-mail account to Mr. Ciminelli's personal g-mail account—an account Mr. Ciminelli infrequently used.  *Id.* ¶ 32.

- Mr. Ciminelli forwarded Dr. Kaloyeros' e-mails and the sections of the draft RFP to two LPCiminelli executives.  *Id.*  At a LPCiminelli firm retreat in early October 2013, LPCiminelli personnel noted in an exchange of e-mails that they were currently working with Dr. Kaloyeros on a project and were interested in "other projects that will spin off of the initiative."  *Id*. ¶ 21.

- On October 15, 2013, FSMC "publicly issued" an RFP "to establish a strategic research, technology outreach, business development, manufacturing, and education and workforce training partnership with a qualified developer or developers in the Greater Buffalo Area [the Buffalo Billion projects]."  *Id.* ¶ 15.  The request contained a provision calling for 50 years of proven experience.  *Id.* ¶ 17.

- "According to a media report by a news organization based in Buffalo, LPCiminelli is "one of the few developers in the Buffalo area that can satisfy the 50-Years Requirement."  *Id.* ¶ 18.

- On November 1, 2013, FSMC e-mailed all developers that had received a copy of the RFP and informed them that the 50-year requirement was a "typographical error" and that 15 years was in fact the requirement.  *Id.* ¶ 22(a)-(b).

- Two LPCiminelli executives expressed disappointment with this news before concluding that "15 is still pretty good."  *Id.*

- LPCiminelli was not the only contactor which won the RFP—there was "another winning bidder" identified in the December 2015 Warrant Affidavit as "Developer-1." *Id*. ¶ 25.

- On January 28, 2014, FSMC adopted a resolution that authorized awarding LPCiminelli work. *Id.* ¶ 23.

- New York State sought a quote from LPCiminelli about this work before publicly announcing that the contract had been awarded.  Id. ¶¶ 24–25.

- Mr. Ciminelli made campaign contributions and was a supporter of Governor Cuomo before and after the issuance of the RFP.  *Id.* ¶¶ 27–28.

Based on this array of innocuous facts, the December 2015 Warrant Affidavit asserts there "is probable cause to believe that KALOYEROS and LOUIS CIMINELLI conspired before the public release of the RFP to include requirements in the RFP that would favor a bid from LPCiminelli, that they knew that they were engaged in criminal conduct, and that they purposefully sought to conceal their criminal conduct." *Id.* ¶ 32.  It further asserts that, based on the affiant's training and experience, "government officials who unlawfully manipulate or influence a competitive bidding process for taxpayer-funded contracts to favor or benefit their co-conspirators will often receive some kind of compensation from those co-conspirator bidders." *Id.*

Notably, the December 2015 Warrant Affidavit does not reveal:  (1) what law, regulation, contract, or industry standard, if any, prohibited communications between FSMC and LPCiminelli about the RFP before the RFP was issued; (2) what evidence suggests that the typographical error in the RFP regarding required work experience was anything other than inadvertent; (3) how the RFP favored LPCiminelli, if at all, after the reference to required work experience was promptly corrected; (4) how the RFP favored LPCiminelli, if at all, in light of the fact that FSMC also selected "another winning bidder"; (5) why Dr. Kaloyeros' use of his

personal g-mail account was improper; and (6) what law, regulation, contract, or industry standard precluded LPCiminelli from making contributions to a politician in the State of New York while engaging in business with a not-for-profit entity funded by the State of New York.

The December 2015 Warrant Affidavit also fails to reveal a number of indisputable facts which substantially undercut the Government's conclusions about what the disclosed facts mean. For example, the December 2015 Warrant Affidavit failed to provide the Court with a copy of the RFP. This is surprising since the Government clearly had the RFP as it was described in detail in the December 2015 Warrant Affidavit, and it was available on FSMC's website—a website which the Government admits it visited before filing the December 2015 Warrant Affidavit. *Id.* ¶ 9. The RFP, which is provided to the Court in support of Dr. Kaloyeros' motion to dismiss (*see* Declaration of Michael C. Miller in Support of Motion to Dismiss Under Federal Rule of Criminal Procedure 12 ("Rule 12 Miller Decl."), Ex. B.), contains provisions which directly conflict with factual assertions in the December 2015 Warrant Affidavit that lie at the heart of the Government's probable cause argument.

For example, the December 2015 Warrant Affidavit alleges in a section entitled "FSMC Chooses LPCiminelli as a Winning RFP Bidder" that FSMC "authorized awarding LPCiminelli one or more taxpayer-funded projects set forth in the RFP." Ex. B at 10. Similarly, the December 2015 Warrant Affidavit suggests throughout that LPCiminelli, by virtue of winning the RFP, had a right to a subsequent awarded of compensable work. The clear implication is that the "taxpayer-funded projects" were the subject of the RFP and that LPCiminelli had a right to them. Not so. In fact, the RFP itself reveals that it did not offer the winning bidder any specific, compensable work, let alone the "taxpayer-funded projects" referenced in the December 2015 Warrant Affidavit.

Rather, the RFP made it clear that the winning bidder would begin "detailed discussions and negotiations . . . which may lead to designation of the preferred candidate as the PREFERRED DEVELOPER, subject, however, to execution of an acceptable agreement by the preferred candidate with FSMC." *Id.* ¶ 7(c). If FSMC was not content with the terms being negotiated with the winning bidder, it could instead negotiate with the runners up. *Id.* ¶ 7(d). If an ultimate preferred developer could not be chosen from the bidders, FSMC could "terminate the process and this RFP" or "reject any and all proposals, in whole or in part." *Id.* ¶ 7(f)-(g). Finally, even a preferred developer was not entitled to any development work. *See Id.* ¶ 8(a)-(c) (stating that FSMC could "[c]ancel the bid at any time" or "[a]ccept or reject any DEVELOPER response in its entirety or in part"). In short, the December 2015 Warrant Affidavit did not disclose the actual content of the RFP to the Court, despite the fact that the contents of the RFP were directly at odds with the rest of the Affidavit.

B.    The March 4, 2016 Search Warrant

On March 4, 2016, the USAO issued a second search warrant seeking identical data from Dr. Kaloyeros' g-mail account as the first search warrant, but for a later period of time, *i.e.*, December 8, 2015 to the present.[3] The search warrant authorized the Government to review the seized materials with no limitations. *See* Ex. C Attach., § II. The affidavit in support of the search warrant (the "March 2016 Warrant Affidavit") recites the same criminal statutes as did the December 2015 Warrant Affidavit.[4] Ex. D, ¶ 3.

---

[3]    A copy of the search warrant is attached to the Miller Decl. as Exhibit C.

[4]    A copy of the affidavit in support of the search warrant is attached to the Miller Decl. as Exhibit D.

The March 2016 Warrant Affidavit is based largely on the allegations set forth in the December 2015 Warrant Affidavit, and evidence gathered as a result of the December 2015 search warrant. *Id.* ¶¶ 10-11.  In substance, the affidavit claims that:

- Dr. Kaloyeros provided, via g-mail, information to a favored developer in Albany (the "Albany Developer") and in Buffalo (the "Buffalo Developer") in advance of the Albany and Buffalo RFPs. *Id.* ¶ 11.

- Todd Howe, the president of a lobbying firm and former aide to Governor Cuomo, e-mailed Dr. Kaloyeros the names and qualifications of the Buffalo Developer and a favored developer in Syracuse (the "Syracuse Developer"). These developers were later awarded projects pursuant to the Buffalo and Syracuse RFPs. *Id.* ¶ 12.

- The Buffalo and Syracuse Developers also provided suggestions prior to the RFP about the terms to be included in the RFP. *Id.* ¶ 27.

- The Albany Developer and Dr. Kaloyeros communicated about the potential students housing needs of an academic institution that Dr. Kaloyeros headed, before issuance of an RFP to build student housing, to enable the Albany Developer to purchase potential sites for the facility. *Id.* ¶ 70.

- Mr. Howe received significant sums from the Syracuse Developer. *Id.* ¶ 61.

- All three developers were substantial political contributors to Governor Cuomo. *Id.* ¶ 13.

Based on these claims, the March 2016 Warrant Affidavit states that there is probable cause to believe that:  (1) the Buffalo and Syracuse RFPs were designed to favor the Buffalo and Syracuse bidders; and (2) there was a conspiracy to enable the Albany developer to purchase lots in advance of an RFP. *Id.* ¶ 70.  The March 2016 Warrant Affidavit again does not explain why these allegations would support the criminal charges on which the March 2016 search warrant is based.

C.    <u>The May 24, 2016 Search Warrant</u>

On May 24, 2016 NYAG issued a search warrant for various locations, including Dr.

Kaloyeros' cell phone.[5]  The search warrant authorized the NYAG to review the seized materials with no limitations.  Specifically, it requests:

- "Financial records, including but not limited to, bank records, credit card records, Federal and State income tax records and returns, credit account records, deposit account records, deposit slips, checks, check stubs, wire transfer records, ledgers, journals, account books, and cash disbursement records, from 2010 to the present;

- Documents, including "contracts, invoices, bills, receipts, business forms, stationary, notes, memos, renderings, and other records of SUNY Poly construction projects"—without any time limitation;

- Correspondence and other communications between Dr. Kaloyeros and Todd Howe, including e-mails and voicemails—without any time limitation; and

- All electronic devices of Mr. Kaloyeros, including computers, laptops, tablets and cellular devices—without any time limitation.

Ex. E at 2.  The fruits of that search were turned over to the USAO.

The May 24, 2016 warrant is based on a purported violation of the Donnelly Act—the New York equivalent of the federal Sherman Antitrust Act.  The affidavit in support of the warrant (the "NYAG Warrant Affidavit")[6] alleges that there was probable cause to believe the Donnelly Act was violated because:

- The Albany RFP was tailored to favor the Albany Developer.  Ex. F, ¶¶ 21–34.

- Fuller Road Management Corporation ("FRMC"), a non-profit on whose board Dr. Kaloyeros served *(id.* ¶ 16), agreed to "make best efforts to extend existing tool installation contract" with a developer in connection with an agreement by the developer to provide a $50 million loan to FRMC.  *Id.* ¶ 38–39.

- Dr. Kaloyeros forced a developer working on an FRMC project to use a particular architect.  *Id.* ¶ 41.

---

[5]    A copy of the search warrant is attached to the Miller Decl. as Exhibit E.

[6]    A copy of the NYAG Warrant Affidavit is attached to the Miller Decl. as Exhibit F.

The NYAG Warrant Affidavit describes this conduct as "bid rigging."  It relies on a single case, *People v. Schwartz*, 160 A.D.2d 964 (N.Y. App. Div. 2d Dep't 1990), to support its claim that Dr. Kaloyeros violated the Donnelly Act.  *Id.* ¶ 8.

## III.    <u>STANDARD</u>

The Fourth Amendment and Federal Rule of Criminal Procedure 41(d) require that a search warrant be based upon probable cause.   U.S. Const. Amend. IV; Fed. R. Crim. P. 41(d).  The Fourth Amendment also requires that the warrant state with particularity the items to be searched and seized and forbids overbreadth.  *United States v. Cioffi*, 668 F. Supp. 2d 385, 390 (E.D.N.Y. 2009).   Particularity "is the requirement that a warrant must clearly state what is sought" and is lacking when the warrant "is so vague that i[t] fails reasonably to alert executing officers to the limits of their search and seizure authority."  *United States v. Scully*, 108 F. Supp. 3d 59, 90 (E.D.N.Y. 2015) (citation omitted).   Breadth "deals with the requirement that the scope of the warrant be limited to the probable cause on which the warrant is based."  *Id.* (citation omitted).

Under the good faith exception, however, even a search warrant lacking in probable cause or particularity will be upheld, absent the following four circumstances:  "(1) where the issuing judge has been knowingly misled; (2) where the issuing judge wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient, such as by failing to particularize the place to be searched or the things to be seized, that reliance upon it is unreasonable."  *United States v. Falso*, 544 F.3d 110, 125 (citations omitted) (original alterations omitted), *suppl. op.* at 293 F. App'x 838 (2d Cir. 2008).  "However, the good faith exception

should not be read so as to 'swallow the exclusionary rule.'"  *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 465 (S.D.N.Y. 2013) (citation omitted).

Where a warrant is predicated on illegally obtained evidence, the reviewing court must "excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant."  *United States v. Trzaska*, 111 F.3d 1019, 1026 (2d Cir. 1997) (citation omitted).

## IV.   ARGUMENT

The fruit of the Government's search warrants should be suppressed.  First, the search warrants were issued without probable cause.  Second, the warrants lack sufficient particularity.  Third, the warrants are not subject to the good faith exception.

### A.   The Three Search Warrants Were Issued Without Probable Cause.

Probable cause is present if "there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Falso*, 544 F.3d at 117 (citation omitted).  "[A] conclusory legal allegation is insufficient to establish the existence of probable cause sufficient to support the issuance of a search warrant."  *United States v. Rutherford*, 71 F. Supp. 3d 386, 392 (S.D.N.Y. 2014).  Here, each of the three warrants was issued without probable cause.

#### 1.   The December 2015 Search Warrant Was Issued Without Probable Cause.

The December 2015 Warrant Affidavit sought issuance of a sweeping search warrant, permitting the Government to harvest and rummage through years of e-mails, fundamentally on the strength of a typographical error in the RFP.  Indeed, the December 2015 Warrant Affidavit alleges that:

- Pre-RFP communications occurred between Dr. Kaloyeros and LPCiminelli, but fails to identify any law, rule, regulation, contract, or industry standard which prohibits these communications;

- There was a typographical error in the RFP related to the years of experience required of a bidder, but fails to offer any evidence that the typographical error was anything but inadvertent, and that, once promptly corrected, it had any impact on the RFP bidding process;

- The RFP bidding process was rigged, but fails to explain how that "rigged" process resulted in "another winning bidder";

- Dr. Kaloyeros used his personal g-mail account, but fails to offer any evidence that his use of a personal g-mail account was improper, much less that he had an "official" FSMC e-mail address that he could have used;

- LPCiminelli made contributions to a New York State politician, but fails to identify a single law, regulation, contract, or industry standard which precluded LPCiminelli from making these contributions while engaged in business with a not-for-profit entity funded by the State of New York.

In short, the December 2015 Warrant Affidavit strings a series of innocuous facts together to weave a probable cause argument that does not stand up to scrutiny.

This is simply too thin a gruel to support probable cause on the criminal statutes on which the search warrant is based.  To establish mail or wire fraud, the Government must prove (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) the use of the mails or wires to further the scheme.  *United States v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007). The December 2015 Search Warrant fails to establish probable cause for either crime.  With respect to the mail and wire fraud claims, the December 2015 Warrant Affidavit: fails to (1) identify any false representation made by either Dr. Kaloyeros or anyone working at LPCiminelli; (2) identify any money or property that was the object of the scheme, since, at best, the RFP gave the winning bidder absolutely nothing of value and no rights whatsoever to compensable work; or (3) assert any facts supporting the notion that anyone was harmed by the alleged conduct, or that anyone even faced the potential for a deprivation of money or property.

-12-

The December 2015 Warrant Affidavit simply fails to support a finding of probable cause that Dr. Kaloyeros (or anyone else) engaged in a scheme to defraud.

Likewise, the December 2015 Warrant Affidavit fails to establish probable cause that Dr. Kaloyeros (or anyone else) engaged in bribery or honest services fraud, both of which require a showing that a bribe was made or offered in connection with official action.  *See McDonnell v. United States,* 136 S. Ct. 2355, 2365 (2016).  With respect to the bribery and honest services claims, there is no allegation of any exchange of money for official action—only lawful First Amendment protected campaign contributions, none of which were made by Dr. Kaloyeros. This is simply not a crime.  *See United States v. Biaggi* , 909 F. 2d 662, 695 (2d Cir. 1990) ("There is a line between money contributed lawfully because of a candidate's positions on issues and money contributed unlawfully as part of an arrangement to secure or reward official action . . . .").

Accordingly, the December 2015 Warrant Affidavit fails to establish probable cause that Dr. Kaloyeros (or anyone else) engaged in criminal conduct to support the issuance of a search warrant for any of the e-mails covered by the warrant.  *See United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992) ("[I]t is obvious that a general [search] warrant authorizing the seizure of 'evidence' without mentioning a particular crime or criminal activity to which the evidence must relate is void under the Fourth Amendment.").

2.     <u>The March 2016 Search Warrant Was Issued Without Probable Cause.</u>

The March 2016 search warrant fares no better.

First, by its own admission, it is premised in significant part on material that was unlawfully obtained through the improper December 2015 Search Warrant.  This material must be excised from the Court's consideration of probable cause. *See United States v. Reilly*, 76 F.3d

1271, 1280 (2d Cir. 1996) (invalidating warrant, in part, because "[t]he issuance of the warrant was itself premised on material obtained in a prior [illegal] search" and the "fruit[s] of the prior search" served as the basis for establishing probable cause to issue the warrant).

Second, even with this improper material included, the search warrant lacks probable cause.  The March 2016 Warrant Affidavit simply lacks the facts necessary to establish the requisite elements of a mail or wire fraud claim.  And, while it adds the allegation that Howe received significant sums from the Syracuse Developer, it again does not describe any money exchanged for official action.  All that it describes is a company paying a lobbyist for his services and a lobbyist acting on behalf of his client.  Those allegations do not establish probable cause that Dr. Kaloyeros (or anyone else) engaged in criminal conduct sufficient to support the issuance of the March 2016 search warrant.

Thus, the March 2016 search warrant was issued without probable cause.

### 3.   The NYAG Search Warrant Was Issued Without Probable Cause.

The NYAG Warrant Affidavit is premised on the notion that a vertical bid rigging scheme between a customer, FRMC (another New York State not-for-profit corporation), and a vendor violates the Donnelly Act.  It does not.

The Donnelly Act is New York State's analogue to the federal Sherman Antitrust Act, and has been called the "Little Sherman Act."   *Anheuser-Busch, Inc. v. Abrams* , 520 N.E.2d 535, 539 (N.Y. 1988).  It is generally "construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language, or the legislative history justify such a result."  *Id.*

Both statutes distinguish between "horizontal" and "vertical" agreements.  Agreements are horizontal when they are between competitors.  *Id.* at 536.  Agreements are vertical when

they are between a customer and a supplier. *Id.* Courts have consistently rejected the notion that a "vertical" bid rigging agreement violates the antitrust laws. *Ruotolo v. Fannie Mae*, 933 F. Supp. 2d 512, 521 (S.D.N.Y. 2013) (specifically in the Donnelly Act context); *Sitkin Smelting & Ref. Co. v. FMC Corp.*, 575 F.2d 440, 447–48 (3d Cir. 1978); *Parmalee Transp. Co. v. Keeshin*, 292 F.2d 794, 804 (7th Cir. 1961); *Tal v. Hogan*, 453 F.3d 1244, 1261 n.15 (10th Cir. 2006).[7]

Their reasoning is simple:

> To allow any auction, bidding, or other competitive sales process to be challenged whenever one potential supplier is distraught because it did not win the sale would be to outlaw competition and salesmanship, for companies and their staffs could not reasonably be expected to compete to win sales, projects, and new clients if, in so doing, they risk treble damages and even imprisonment when even one rival is disappointed with the results.

*Expert Masonry, Inc. v. Boone Cty.*, Ky., 440 F.3d 336, 347–48 (6th Cir. 2006). Moreover, as the Supreme Court has held:

> The freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage. . . . At the same time, other laws, for example, "unfair competition" laws, business tort laws, or regulatory laws, provide remedies for various "competitive practices thought to be offensive to proper standards of business morality."

*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 137 (1998) (citations omitted).

---

[7]   *See also Phillips Getschow Co. v. Green Bay Brown Cty. Prof'l Football Stadium Dist.*, 270 F. Supp. 2d 1043, 1050 (E.D. Wis. 2003); *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F. Supp. 2d 1066, 1089 (D. Colo. 2012); *Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc.*, 801 F. Supp. 1450, 1463–64 (E.D. Pa. 1992); *Banneker Ventures, LLC v. Graham*, 19 F. Supp. 3d 231, 251 (D.D.C. 2014), *aff'd in part*, *rev'd in part on other grounds*, 798 F.3d 1119 (D.C. Cir. 2015); *Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 747 (D. Md. 1997), *aff'd*, 141 F.3d 1162 (4th Cir. 1998); *TMT Mgmt., Grp., LLC v. U.S. Bank Nat'l Ass'n*, No. CV 14-4692, (MJD/JSM), 2016 WL 730254, at *26–27 (D. Minn. Jan. 4, 2016); *MHB Distrib., Inc. v. Parker Hannifin Corp.*, 800 F. Supp. 1265, 1268 (E.D. Pa. 1992); *United States v. Ashland Warren, Inc.*, 537 F. Supp. 433, 445 (M.D. Tenn. 1982).

Here, the alleged conduct revolved around vertical bid rigging because it concerned a purported agreement by FRMC to favor a supplier—not agreements between the supplier and its competitors.  It therefore cannot represent an antitrust violation as a matter of law.

The NYAG Warrant Affidavit cites a case to support its proposition that a bid rigging scheme between a customer and a supplier is covered by the Donnelly Act.  That decision, the *Schwartz* case, does not authorize prosecution of vertical bid rigging schemes under the Donnelly Act.  The *Schwartz* case is a Second Department case from 1990.  It is one paragraph long, and it involves horizontal conduct, not vertical conduct.  Specifically, the court in *Schwartz* addressed whether ostensible competitors that shared some common ownership were capable of conspiring with one another, or if they should be considered a single entity, and therefore incapable of forming a conspiracy.  *Schwartz*, 160 A.D.2d at 965.  The Second Department concluded that these entities could, in fact, conspire with one another.  *Id*.  In doing so, it relied on a prior New York state case—*Bevilacque v. Ford Motor Co.*, 125 A.D.2d 516 (N.Y. App. 2d Dep't 1986)—which held that, while wholly owned subsidiaries could not conspire with one another, companies that were merely affiliated could do so.  160 A.D.2d at 965.

Because there is no support for the claim that the alleged conduct violated the Donnelly Act, the NYAG search warrant lacks probable cause.  *George,* 975 F.2d at 77 ("[A] warrant not limited in scope to *any crime at all* is . . . unconstitutionally broad.").

B.    The Warrants Are Overbroad and Lack Particularity.

"Courts implement the particularity requirement by insisting that warrants not 'leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized.'  In other words, a warrant must contain sufficient specificity 'to permit the rational exercise of judgment by the executing officers in selecting what items to seize.'" *Zemlyansky*,

945 F. Supp. 2d at 453 (citations omitted).  While there is "no settled formula" in making this determination, courts generally look to whether the warrant explains the crime being searched for and whether the warrant contains a catch-all phrase authorizing a blunderbuss search and seizure. *Id.* at 453.   Likewise, the overbreadth prohibition in the Warrants Clause prevents the Government from "seeking specific material as to which no probable cause exists."  *Cioffi*, 668 F. Supp. 2d at 390 (citation omitted).

Here, the warrants are overbroad and lack the requisite particularity because they (1) include e-mails and cellular data in a catch-all fashion without any connection to the alleged crimes, and (2) do not provide any description of the specific locations to be searched.  The December 2015 and March 2016 Warrants permitted the Government to indiscriminately seize Dr. Kaloyeros' g-mail correspondence over a three-plus year period of time—December 1, 2012 to March 4, 2016, and review any and all correspondence in that time period with no limitation.[8] Similarly, the NYAG warrant allowed it to seize all materials on Dr. Kaloyeros' cell phone without limitation.[9]

This is improper.  *Zemlyansky*, 945 F. Supp. 2d at 456, 458 (finding a warrant lacking in particularity that did "not direct searching officers to seize evidence *related to*, or *concerning*, any particular crime or type of crime" and instead "indiscriminately permit[ted] the search of all 'Computers' and 'Thumb drives'."); *United States v. Rosa* , 626 F.3d 56, 64 (2d Cir. 2010)

---

[8]     *See* Ex. A (requesting "[a]ll emails sent to or from" Dr. Kaloyeros's account, including drafts, for the period December 1, 2012 to present); Ex. C. ("requesting "[a]ll emails sent to or from" Dr. Kaloyeros's account, including drafts, from the period December 8, 2015 to present).

[9]     *See* Ex E. (requesting all electronic devices of Dr. Kaloyeros without any time limiters or description of the items to be searched on the devices).

("[B]ecause the warrant here did list specific items to be seized, the description in the search warrant of Rosa's residence was overbroad and provided the officers with no judicial limit on the scope of their search, especially as it related to the seizure of electronically stored notes and records tending to identify criminal conduct."); *Cioffi*, 668 F. Supp. 2d at 396 (granting motion to suppress of defendant charged with wire fraud and wire fraud conspiracy because the warrant "did not, on its face, limit the items to be seized from [defendant]'s personal email account to emails containing evidence of the crimes charged in the indictment, or, indeed, any crime at all all."); *George*, 975 F.2d at 75 ("The instant warrant's broad authorization to search for 'any other evidence relating to the commission of a crime' plainly is not sufficiently particular with respect to the things to be seized because it effectively granted the executing officers' 'virtually unfettered discretion to seize anything they [saw]'.") (citation omitted) (alteration in original).[10]

While some courts[11] have afforded greater leeway in the context of electronically stored information, we respectfully submit that this Court should not adopt that approach.  "[W]hatever new challenges computer searches pose in terms of particularity, it is always necessary—and hardly onerous—to confine *any* search to evidence of particular crimes."  *See Cioffi*, 668 F.

---

[10]    The May 24, 2016 Search Warrant's lack of any temporal limitations also violates the particularity requirement. *See United States v. Costin*, No. CRIM 3:05-CR-38 JCH, 2006 WL 2522377, at *12 (D. Conn. July 31, 2006) ("A warrant's failure to include a time limitation, where such limiting information is available and the warrant is otherwise wide-ranging, may render it insufficiently particular."); *United States v. Hickey* , 16 F. Supp. 2d 223, 239 (E.D.N.Y. 1998) ("Clearly, the warrants, being devoid of a time limitation, authorized searches for documents that both pre-date and post-date the periods of charged criminality. This void supports defendants' overbreadth argument.").

[11]    *See, e.g.*, *In re Warrant for all Content & Other Info. Associated with the Email Account xxxxxxx@gmail.com Maintained at Premises Controlled by Google Inc.* , 33 F. Supp. 3d 386, 395–96 (S.D.N.Y. 2014);  *Scully*, 108 F. Supp. 3d at 91–93; *United States v. Alston*, No. 15-cr-435 (CM), 2016 WL 2609521, at *6 (S.D.N.Y. Apr. 29, 2016).

Supp. 2d at 392.  Permitting these sweeping and unfettered search warrants would allow the sort of general search warrants that are an anathema to the Fourth Amendment.  *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013) (holding that "the chief evil that prompted the framing and adoption of the Fourth Amendment was the 'indiscriminate searches and seizures' conducted by the British 'under the authority of general warrants'") (citation omitted).

Under these circumstances, these warrants simply do not pass constitutional muster.

C.    The Warrants Are Not Subject to the Good Faith Exception.

"Good faith is not a magic lamp for police officers to rub whenever they find themselves in trouble. For the good faith exception to apply, the police must reasonably believe that the warrant was based on a valid application of the law to the known facts." *Reilly*, 76 F.3d at 1280. Here, the warrants are not subject to the good faith exception for three reasons.

First, the affidavits in support of the search warrants contain material omissions that knowingly misled the issuing judge.  As noted, above, the December 2015 Warrant Affidavit failed to provide the Court with a copy of the RFP, which would have demonstrated to the Court that the actual RFP is in conflict with the core facts supporting the Government's probable cause argument.  The Government had the RFP in its possession when it drafted the December 2015 Warrant Affidavit—indeed, they cite to its contents repeatedly—but did not share it with the Court and, as a result, knowingly misled the issuing judge.

This non-disclosure meant the issuing judge was missing key facts which debunk the Government's probable cause argument.  For example, the December 2015 Warrant Affidavit created the impression that LPCiminelli, by winning the RFP, received the right to perform and be paid for a number of lucrative "taxpayer-funded projects."  Ex. B at 10 ("FSMC Chooses LPCiminelli as a Winning RFP Bidder" and FSMC "authorized awarding LPCiminelli one or

-19-

more taxpayer-funded projects set forth in the RFP."). This is simply not what happened. The RFP itself reveals that it did not offer the winning bidder any specific, compensable work. More specifically, the RFP did not offer the winning bidder the "taxpayer-funded projects" referenced in the December 2015 Warrant Affidavit. And the issuing judge was not informed about any of these facts.

More broadly, the December 2015 Warrant Affidavit suggested that LPCiminelli, by virtue of winning the RFP, had a right to actual compensable work. It did not. The RFP gave the winning bidder no such right. The RFP made it clear that FSMC: (1) would engage in a subsequent round of negotiations with the winning bidder to see if agreement could be reached on the terms for actual compensable work, (2) could negotiate with the runners up in the bidding process if FSMC was not content with the terms being negotiated with the winning bidder, and (3) had, at all times, the right to terminate the process and engage in no business with the winning bidder or anyone else. The actual language of the RFP completely undermines the December 2015 Warrant Affidavit's claim for probable cause. As a result of the Government's decision not to include the RFP as an exhibit to its December 2015 Warrant Affidavit, the Government knowingly misled the issuing judge about facts that lie at the heart of the Government's claim for probable cause.

Second, the applications are so lacking in indicia of probable cause that they render reliance upon the warrants unreasonable. The affidavits lack even traces of the basic elements that are necessary to establish the crimes on which they are predicated. Instead, they are premised entirely on speculation and innuendo. They, therefore, should not be afforded the good faith exception. *Rutherford*, 71 F. Supp. 3d at 393 (finding the good faith exception inapplicable when "the warrant and application are, on their face, so lacking in indicia of probable cause for

suspicion of criminal activity as to render reliance upon them unreasonable, and the warrant is so facially deficient that reliance upon it was unreasonable" and excluding this evidence from trial); *George*, 975 F.2d at 78 (finding the good faith exception inapplicable where warrant was "the type of facially invalid warrant that could not have been relied upon in good faith because 'one who simply looked at the warrant, . . . would . . . suspect it was invalid'") (citation omitted).

Third, the applications are similarly deficient with respect to particularity. They essentially authorized an unfettered rummaging—without any type of effort to target relevant documents—through Dr. Kaloyeros' and Mr. Ciminelli's e-mails and Dr. Kaloyeros' cell phone. Courts have repeatedly rejected this type of warrant. *Cioffi*, 668 F. Supp. 2d 385 at 397 (finding good faith exception inapplicable where warrant to search personal e-mail account of defendant charged with wire fraud was not limited to evidence of the crimes charged because "'the seizure of evidence without mentioning a particular crime or criminal activity to which the evidence must relate is void under the Fourth Amendment' [and] 'no reasonably well-trained officer could believe otherwise'") (citation omitted); *Zemlyansky*, 945 F. Supp. 2d at 476 (finding the same).

V.    **CONCLUSION**

For the reasons set forth above, the Court should suppress the evidence recovered as a result of the December 2015 Search Warrant, the March 2016 Search Warrant, and the NYAG Search Warrant.

/s/ Michael C. Miller
Michael C. Miller
Jeffrey A. Novack
Katherine M. Dubyak
David B. Hirsch
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900

*Counsel for Alain Kaloyeros*

Dated: May 19, 2017