# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                           :

UNITED STATES OF AMERICA       :
                           :

       v.                    :
                           :     Case No. 16-cr-00776 (VEC)

ALAIN KALOYEROS, et al.,     :
                           :

      Defendants.         :
                           :

-------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT ALAIN KALOYEROS'
## MOTION TO DISMISS UNDER
## FEDERAL RULE OF CRIMINAL PROCEDURE 12

Michael C. Miller
Jeffrey A. Novack
Katherine M. Dubyak
David B. Hirsch
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900

*Counsel for Alain Kaloyeros*

Dated: May 19, 2017

# TABLE OF CONTENTS

I.      INTRODUCTION ......................................................................................................1

II.     BACKGROUND ........................................................................................................3

        A.      Factual Background ........................................................................................3

        B.      Procedural History ........................................................................................8

III.    STANDARD..............................................................................................................10

IV.     ARGUMENT ............................................................................................................11

        A.      The Facts Alleged Do Not Constitute Wire Fraud.............................................11

                1.      The Indictment Fails to Allege Money or Property as the Object of
                        the Scheme. ........................................................................................11

                2.      The Indictment Fails to Allege a Scheme to Defraud................................13

        B.      The RFPs Themselves Indisputably Show That No Fraud Occurred. ...................15

        C.      The "Right to Control" Theory Is No Longer Tenable.........................................17

                1.      The Right to Control Theory Contradicts Three Supreme Court
                        Decisions.............................................................................................17

                2.      *Finazzo* Was Wrongly Decided. .........................................................19

V.      CONCLUSION..........................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Duncan v. Walker*,
533 U.S. 167 (2001).................................................................................................19

*Hunts Point Terminal Produce Co-op. Ass'n, Inc. v. N.Y. City Econ. Dev. Corp.*,
36 A.D.3d 234 (N.Y. App. Div. 1st Dep't 2006)..........................................................7

*McNally v. United States*,
483 U.S. 350 (1987).................................................................................................18

*Porcelli v. United States*,
404 F.3d 157 (2d Cir. 2005).....................................................................................20

*Sekhar v. United States*,
133 S. Ct. 2720 (2013).......................................................................................*passim*

*Skilling v. United States*,
561 U.S. 358 (2010).................................................................................17, 18, 19, 20

*United States v. Alyenikov*,
737 F. Supp. 2d 173 (S.D.N.Y. 2010)......................................................................10

*United States v. Binday*,
804 F.3d 558 (2d Cir. 2015).....................................................................................13

*United States v. Capoccia*,
503 F.3d 103 (2d Cir. 2007).....................................................................................10

*United States v. Cleveland*,
531 U.S. 12 (2000).................................................................................12, 13, 17, 18

*United States v. Covington*,
395 U.S. 57 (1969).....................................................................................................5

*United States v. Finazzo*,
850 F.3d 94 (2017), *additional op.*, Nos. 14-3213-cr(L), 14-3330-cr(Con),
2017 WL 922966 (2d Cir. Mar. 7, 2017)................................................17, 19, 20

*United States v. Flores*,
404 F.3d 320 (5th Cir. 2005) .....................................................................................5

*United States v. Forrester*,
No. 02 CR.302 WHP, 2002 WL 1610940 (S.D.N.Y. July 22, 2002).........................5

*United States v. Frutos-Lopez*,
  627 F. Supp. 2d 1164 (C.D. Cal. 2008), *aff'd*, 390 F. App'x 745 (9th Cir.
  2010) .......................................................................................................5

*United States v. Kurtz*,
  No. 04-CR-0155A, 2008 WL 1820903 (W.D.N.Y. Apr. 21, 2008) .......................14

*United States v. Martino*,
  No. S1 00 CR 389 (RCC), 2000 WL 1843233 (S.D.N.Y. Dec. 14, 2000) ..............5

*United States v. Mittelstaedt*,
  31 F.3d 1208 (2d Cir. 1994).................................................................14

*United States v. Novak*,
  443 F.3d 150 (2d Cir. 2006)..................................................................13

*United States v. Regent Office Supply*,
  421 F.2d 1174 (2d Cir. 1970)................................................................14

*United States v. Rossomando*,
  144 F.3d 197 (2d Cir. 1998).................................................................14

*United States v. Sadler*,
  750 F.3d 585 (6th Cir. 2014) ...............................................................19

*United States v. Shellef*,
  507 F.3d 82 (2d Cir. 2007)..................................................11, 14, 15

*United States v. Silver*,
  103 F. Supp. 3d 370 (S.D.N.Y. 2015)........................................................8

*United States v. Silver*,
  117 F. Supp. 3d 461 (S.D.N.Y. 2015)......................................................11

*United States v. Stavroulakis*,
  952 F.2d 686 (2d Cir. 1992).................................................................10

**Statutes**

18 U.S.C. § 1343 ......................................................................18, 19

**Rules**

Fed. R. Crim. P. 12(b)(1) ......................................................................5

**Other Authorities**

Benjamin Weiser, *Cuomo Won't Face Federal Charges Over Moreland Ethics
  Panel*, N.Y. Times (Jan. 11, 2016) .........................................................9

Colby Hamilton, *After Silver Arrest, Bharara mocks 'three men in a room'*, Politico (Jan. 23, 2015), http://www.politico.com/states/new-york/albany/story/2015/01/after-silver-arrest-bharara-mocks-three-men-in-a-room-019119 ............................................................................................8

Niraj Chokshi, *Prosecutor: 'We are deadly serious' about taking down corrupt officials in New York*, Wash. Post (May 4, 2015) ..................................................8

Defendant Alain Kaloyeros ("Dr. Kaloyeros") respectfully submits this memorandum of law, together with the Declaration of Michael C. Miller ("Miller Decl."), in support of his motion to dismiss the Government's May 11, 2017 superseding indictment (the "Indictment" or "Ind.").

## I. <u>INTRODUCTION</u>

This case began noisily. Leaks to the press that arrests were forthcoming. Early morning raids by the FBI. The former U.S. Attorney vouching that this case would show "in gory detail" how "companies got rich and the public got bamboozled." The case should end quietly with the dismissal of the Indictment against Dr. Kaloyeros.

This is because the case against Dr. Kaloyeros is a political witch-hunt in search of a legal theory. The former U.S. Attorney was open in his hostility towards the so-called "three-men in a room" that he claimed control New York government—the Assembly Speaker, State Senate Majority Leader, and Governor. Two of those three men—Speaker Silver and Majority Leader Skelos—have now been convicted. With the third, Governor Cuomo, apparently beyond reach, the U.S. Attorney's office instead targeted individuals tangentially associated with Governor Cuomo, including Dr. Kaloyeros.

After receiving his Ph.D. in physics, Dr. Kaloyeros was recruited to SUNY's faculty nearly 30 years ago by the late Governor Mario Cuomo. Working under five different Governors sitting across the political spectrum, including Andrew Cuomo, Dr. Kaloyeros was a constant for SUNY: he spearheaded the state's nanotechnology initiative and built public/private partnerships that benefited students, created cutting-edge technology, and brought thousands of high-tech jobs to upstate New York.

The Indictment focuses on two of these projects—one in Buffalo and another in Syracuse. It alleges that Dr. Kaloyeros—a board member of Fort Schuyler Management Corporation ("FSMC"), a non-profit affiliated with SUNY—deceived FSMC by representing

that the bidding process it used to qualify developers for potential future projects in Buffalo and Syracuse was "fair, open, and competitive."

The Indictment[1] alleges that this was false because Dr. Kaloyeros and others had "secretly tailor[ed]" requests for proposals ("RFPs") used in the bidding process to favor two specific developers. Notably absent, however, are any allegations that the conduct alleged: (1) had any actual or even potential impact on the price FSMC paid on any contract; (2) deprived FSMC of the benefit of its bargain on any contract; or (3) concerned information that had any independent value or bore on the ultimate value of any transaction. Absent also are any allegations that Dr. Kaloyeros derived a pecuniary benefit from the supposed conspiracy, or that FSMC received anything other than a great end-product at a reasonable price on any project during Dr. Kaloyeros' tenure. The absence of such allegations is not for lack of trying. Since the filing of the Complaint, the Government has marshaled its awesome investigative powers to comb through Dr. Kaloyeros' personal life, going so far as to question his tennis instructor and request documents from his gym.

With nothing to show for these efforts, the Government relies on the threadbare allegations described above to charge Dr. Kaloyeros with conspiracy to commit wire fraud and two substantive counts of wire fraud. Permitting the Government to proceed on this theory would stretch the wire fraud statute, loved by prosecutors for its flexibility, beyond even its breaking point. This is so for three reasons.

First, the Government has failed to adequately allege wire fraud conspiracy or wire fraud. The Indictment does not allege the deprivation of any money or property, as required to properly

---

[1] The "Indictment" refers to the Superseding Indictment filed May 11, 2017. [Docket No. 162].

plead wire fraud or wire fraud conspiracy. At best, it alleges the deprivation of a non-cognizable recommendation. The Indictment also fails to allege a scheme to defraud as required. This is because: (1) the Indictment fails to allege that Dr. Kaloyeros contemplated any actual harm or injury to FSMC; and (2) to the extent the Indictment is premised on a "right to control" theory, under which the purported deprivation is of FSMC's right to control its decision-making process, that theory requires, and the Indictment fails to allege, that the information at issue had independent value or bore on the ultimate value of the transaction.

Second, looking beyond the pleadings, there was simply no fraud here. The RFPs at issue, which this Court may consider on a motion to dismiss, do not favor any particular bidder. What they do favor is a qualified bidder.

Third, to the extent the Government is proceeding on a "right to control" theory, that theory is no longer tenable.

In short, this is a prosecution without a legal or factual basis. Already it has cost Dr. Kaloyeros his reputation, threatened to destroy the initiatives and institutions he built, and put at risk the upstate jobs he helped create. The Court should not let this case proceed further. The Indictment should be dismissed.

## II.   **BACKGROUND**[2]

We detail below the relevant factual and procedural background.

### A.   Factual Background

In 1987, Dr. Kaloyeros graduated from the University of Illinois with a Ph.D. in experimental condensed matter physics and was recruited by then Governor Mario Cuomo to

---

[2]   The background contained herein is drawn, in part, from the Indictment and criminal Complaint. The Indictment and Complaint's allegations are accepted as true solely for purposes of this motion to dismiss.

join the faculty at the University at Albany, State University of New York ("SUNY"). Dr. Kaloyeros quickly climbed SUNY's ranks in the years that followed. In 2008, he helped create the College of Nanoscale Science and Engineering ("CNSE") and became its Senior Vice President and Chief Executive Officer. Dr. Kaloyeros also stewarded a growing portfolio of successful public/private partnerships designed to revitalize upstate New York. Consistent with that history, Dr. Kaloyeros joined the Board of Directors of FSMC, a private non-profit created to develop public/private partnerships on SUNY's behalf. Ind. ¶¶ 7–8. In 2012, Todd Howe— who previously held several high-profile positions working for both Governor Mario Cuomo and Governor Andrew Cuomo—was retained as a consultant through CNSE's existing relationship with the law firm of Whiteman, Osterman, and Hannah ("WOH"). *Id.* ¶¶ 10–11.

According to the Indictment, Howe acted as an agent for CNSE with respect to development projects, and as a liaison between the college and the Governor's senior staff. *Id.* ¶ 11. The Indictment also alleges that Howe was concurrently retained by a Syracuse-based real estate development firm (the "Syracuse Developer") and a Buffalo-based construction and development company (the "Buffalo Developer") (collectively, the "Developers"). *Id.* ¶ 12. It further alleges that these firms also made "sizable contributions" to Governor Cuomo. *Id.* ¶ 23. The Indictment does not allege, however, that Dr. Kaloyeros had any knowledge of Howe's relationship with the Developers, or their contributions to Governor Cuomo's reelection campaign. Nor does the Indictment allege that Dr. Kaloyeros profited from the alleged scheme in any way.

The Indictment nonetheless alleges that, in 2013 and 2014, Howe and Kaloyeros: (1) caused FSMC to issue RFPs for projects in Syracuse and Buffalo; (2) "secretly tailor[ed]" the RFPs to favor the Developers; and (3) provided "secret information" to the Developers. *Id.* ¶¶

23–24. The Indictment alleges that they did so because they had pre-selected the Developers to win the RFPs and, notwithstanding this, falsely represented to FSMC that the RFP process was "fair, open, and competitive." *Id*. ¶¶ 39, 41, 45.

The Indictment does not detail how these RFPs—which are substantively identical[3]—were supposedly secretly tailored to pre-select different developers in different regions. The Government's September 20, 2016 Complaint, however, appears to offer the missing detail. It alleges that the Developers had pre-RFP contact with Howe and Dr. Kaloyeros that influenced the design of the RFPs. Specifically, it alleges that:

- The Syracuse RFP incorporated a provision calling for the developer to use "sophisticated tools and advanced capabilities (such as InSite Sitework (www.insitesortware.com) to accurately and efficiently coordinate all aspects of site and utility construction, to develop ideal building conditions, and USGlobalNet, or USGN's (www.usgn.net) web-based project management software) to effectively manage projects expeditiously, professionally, on-time, and within budget." Comp. ¶ 78. The Complaint alleges that the two cited software tools were previously listed as part of the Syracuse Developer's qualifications in an e-mail sent by it to Howe and forwarded to Dr. Kaloyeros. *Id*. ¶ 78.

- While a draft of the Syracuse RFP called for the developer to submit "audited financials," the ultimate RFP allowed "audited financials or [a]

---

[3] The Syracuse RFP is attached to the Miller Decl. as Exhibit A. The Buffalo RFP is attached to the Miller Decl. as Exhibit B. Both documents were obtained from FSMC's publicly accessible website at www.ftsmc.org. The Court may consider these publicly available materials because their contents cannot be disputed. *United States v. Covington*, 395 U.S. 57, 60 (1969) (noting that, under Federal Rule of Criminal Procedure 12(b)(1), any defense capable of determination without a trial may be raised before trial by motion); *United States v. Flores*, 404 F.3d 320, 324 (5th Cir. 2005) (recognizing that it is permissible to look beyond the indictment to resolve issues of law on undisputed facts); *United States v. Frutos-Lopez*, 627 F. Supp. 2d 1164, 1166 (C.D. Cal. 2008) (recognizing that extrinsic evidence may be considered on a Rule 12(b) motion to dismiss) , *aff'd*, 390 F. App'x 745 (9th Cir. 2010). *See also United States v. Forrester*, No. 02 CR.302 WHP, 2002 WL 1610940, at *1 (S.D.N.Y. July 22, 2002) (recognizing authority to consider extrinsic materials); *United States v. Martino* , No. S1 00 CR 389 (RCC), 2000 WL 1843233, at *1 (S.D.N.Y. Dec. 14, 2000) (same).

letter of financial reference from [a] major financial institution." *Id*. ¶ 78. The Complaint alleges that the Syracuse Developer had previously suggested to Howe that the RFP not require that the developer submit audited financials while noting that they were "not available—typically prepared for not-for-profits, or public corp." *Id*. ¶ 78.

• The Buffalo RFP incorporated a provision calling for "the achievement of at least 23% Women and Minority Owned Business Enterprise participation (WMBE). Accordingly, it is expected that DEVELOPER be able to demonstrate a track record in WMBE participation." *Id*. ¶ 80. The Complaint alleges that the Buffalo Developer had previously suggested by e-mail to Howe that "If the RFQ Included something about MWBE promotion and compliance, that would be helpful" and that Howe had told Dr. Kaloyeros "stronger on the mwbe than usual would help." *Id*. ¶ 79.

• The Buffalo RFP that was initially issued in October 2013 differed from the Syracuse RFP in that the Buffalo RFP called for 50 years of experience while Syracuse called for 15 years of experience. *Id*. ¶ 80. The Complaint alleges that the Buffalo Developer had previously highlighted to Howe and Kaloyeros that it had "over 50 years of experience." *Id*. ¶ 79. The Complaint admits, however, that, on November 1, 2013, FSMC issued an e-mail to all developers who had expressed interest in the Buffalo RFP explaining that the "50 years" was a typographical error and amended the requirement to be consistent with the 15 year requirement of the Syracuse RFP. *Id*. ¶ 80.

The Indictment alleges that the Developers, in fact, won the Buffalo and Syracuse RFPs and were later awarded contracts. Ind. ¶¶ 13, 16. It acknowledges, however, that winning the RFPs merely gave the Developers "preferred developer" status and the <u>potential</u> to be awarded a project. *Id*. ¶¶ 13, 16 (describing the Developers as preferred developers and their receipt of contracts as separate from winning the RFP). Specifically, the Indictment alleges that "preferred developer" status permitted a "developer to be chosen for SUNY Poly development projects . . . without further competitive bidding." *Id*. ¶ 10. The Indictment does not allege, however, that any competitive bidding was required in the first place. Indeed, FSMC could have selected any developer for any project at any time and was not required to issue an RFP. *Hunts Point Terminal Produce Co-op. Ass'n, Inc. v. N.Y. City Econ. Dev. Corp.*, 36 A.D.3d 234, 245–46

(N.Y. App. Div. 1st Dep't 2006) (finding New York City Economic Development Corporation, a non-profit development corporation like FSMC, was not subject to any "competitive bidding" requirement).

This is consistent with the plain text of the RFPs. The RFPs: (1) were designed to pre-qualify a strategic development partner for potential projects in the region and did not identify any specific projects; (2) contained almost entirely generic terms and did not call for specific pricing information (since there was no identified project), only "fee methodology"; and (3) were non-binding, as they did not commit FSMC to any project and, in any event, broadly and repeatedly reserved FSMC's right to do as it pleased—including terminating a relationship with any developer at will.[4] In short, FSMC had unfettered authority to manage its construction projects, and could have terminated its relationships with the Developers at any time regardless of their preferred developer status.

Simply put, being selected as a preferred developer guaranteed nothing. Moreover, the Indictment nowhere alleges that FSMC was in any way harmed by the process that followed the selection of the Developers.

---

[4]   *See, e.g.*, Ex. A at Sections 1.A(a) (soliciting proposals "to enter into a strategic partnership for <u>potential</u> research, technology outreach, business development, manufacturing, and education and training hub(s)") (emphasis added), 2 (listing developer requirements); 5 (requiring fee methodology as a deliverable); 7(h) ("FSMC also reserves the right to effectuate any of the following: to negotiate change in the scope of services, to modify, restructure, or expand in whole or in part the proposed DEVELOPER and/or PREFERRED DEVELOPER Project Team, and to waive any technicalities as deemed in its best interest."), 8(A) (reserving right to "[c]ancel the bid at any time," "[a]ccept or reject any DEVELOPER response in its entirety or in part," "[s]elect multiple DEVELOPERS.").

Procedural History

On January 21, 2015, the Government filed a sealed criminal complaint against Assembly Speaker Sheldon Silver. *United States v. Silver*, 103 F. Supp. 3d 370, 373 (S.D.N.Y. 2015). On January 22, 2015, with the complaint still sealed, the press began to report on Silver's arrest. *Id.* The next day, the complaint was unsealed and the former U.S. Attorney gave a widely publicized speech in which he criticized the "three men in a room"—the Governor, Speaker, and Senate Majority Leader—that he claimed "wield all the power" in New York.[5] That speech was the subject of this Court's sharp disapproval for its inflammatory rhetoric and the U.S. Attorney's repeated invocation of "as alleged," a phrase the Court concluded was "designed only to 'check the box' of saying the word 'alleged.'" *Silver*, 103 F. Supp. 3d at 378–79 & n.7.

Four months later, in May 2015, the Government brought charges against Senate Majority Leader Dean Skelos, after which the U.S. Attorney stated that "public corruption is a deep-seated problem in New York State."[6]

By December 2015, both Silver and Skelos had been convicted. Jury Verdict, *Silver*, 117 F. Supp. 3d 461 (Dkt. No. 15-cr-0093-VEC); Jury Verdict, *United States v. Skelos* , No. 15-0317(KMW), 2016 WL 15322523 (S.D.N.Y. 2016) . Only Governor Cuomo was left standing

---

[5]    Colby Hamilton, *After Silver Arrest, Bharara mocks 'three men in a room'*, Politico (Jan. 23, 2015), http://www.politico.com/states/new-york/albany/story/2015/01/after-silver-arrest-bharara-mocks-three-men-in-a-room-019119.

[6]    Niraj Chokshi, *Prosecutor: 'We are deadly serious' about taking down corrupt officials in New York* , Wash. Post (May 4, 2015), https://www.washingtonpost.com/blogs/govbeat/wp/2015/05/04/first-new-yorks-assembly-speaker-was-charged-with-corruption-today-the-senate-president-was-too/?utm_term=.62fad91f1c9c.

after the Government released a statement in January 2016 that it would not seek criminal charges against him in connection with the shuttered Moreland Commission investigation.[7]

Apparently unable to reach Governor Cuomo, on September 20, 2016, the Government filed a sealed complaint targeting Dr. Kaloyeros and others associated with Governor Cuomo. [Docket No. 1]. On September 21, 2016, with the Complaint still sealed, news media began reporting that an arrest was forthcoming. On September 22, 2016, the FBI conducted raids and the Complaint was unsealed. The same day, the former U.S. Attorney gave another press conference, at which he stated:

- "In essence, today's complaint shines a light on yet another sordid side of the show me the money culture that has so plagued the government in Albany. It turns out that the state legislature does not have any kind of monopoly on crass corruption in New York."

- "As alleged, through rigged bids, state contracts worth nearly a billion dollars for public development projects meant to revitalize and renew upstate NY, were instead just another way the corrupted reward cronies willing to pay to play."

- "Companies got rich and the public got bamboozled."

- "I really do hope that there is a trial in this case so that all New Yorkers can see, in gory detail, what their state government has been up to."

Press Conference, United States Attorney for the Southern District of New York (Sept. 22, 2016).

On November 22, 2016, the Government filed a 14-count Indictment. [Docket No. 49]. On May 11, 2017, the Government filed a superseding 15-count Indictment. [Docket No. 162]. Three counts—Counts 1, 2, and 4—pertain to Dr. Kaloyeros. In Count 1, Dr. Kaloyeros is

---

[7]     Benjamin Weiser, *Cuomo Won't Face Federal Charges Over Moreland Ethics Panel*, N.Y. Times (Jan. 11, 2016), http://www.nytimes.com/2016/01/12/nyregion/in-moreland-commission-inquiry-insufficient-evidence-to-prove-a-crime.html.

charged with conspiracy to commit wire fraud based on both the Syracuse and Buffalo RFP processes. In Count 2, Dr. Kaloyeros is charged with wire fraud based on the Syracuse RFP. In Count 4, Dr. Kaloyeros is charged with wire fraud based on the Buffalo RFP.

Each of the charges is premised on the theory that FSMC was defrauded because Dr. Kaloyeros and Howe represented to FSMC that the bidding process was fair, open, and competitive, when the RFPs were allegedly secretly tailored to favor the Developers.

## III.  **STANDARD**

Rule 12(b) of the Federal Rules of Criminal Procedure permits pre-trial motions on "any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R. Crim. P. 12(b)(2). On such a motion, "the facts alleged by the government must be taken as true." *United States v. Alyenikov*, 737 F. Supp. 2d 173, 176 (S.D.N.Y. 2010) (citation omitted).

However, courts may assess the sufficiency of the Indictment in three respects. First, at a minimum, an indictment must allege the elements of the offense charged. *United States v. Capoccia*, 503 F.3d 103, 113 (2d Cir. 2007). And, to the extent an offense "includes generic terms, it is not sufficient that the indictment shall charge the offense in the same generic terms as the definition." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (citation omitted). Rather, "it must state the specifics" and "descend to particulars." *Id.* (citation omitted). Second, "[d]ismissal [of an indictment] is required where the conduct alleged in the indictment as a factual basis for the offense is not actually prohibited by the language of the statute." *Aleynikov*, 737 F. Supp. 2d at 176. Third, the Court may consider the sufficiency of the evidence where the Government has made what can be described as a full proffer of the evidence it intends to present. *United States v. Silver*, 117 F. Supp. 3d 461, 465 (S.D.N.Y. 2015).

IV.   **ARGUMENT**

The Indictment must be dismissed for three reasons.  First, the facts alleged do not

constitute wire fraud conspiracy or wire fraud.  Second, the terms of the RFPs indisputably show

that no fraud occurred.  Third, to the extent the Government is relying on the "right to control"

legal theory, that theory is no longer tenable.[8]

A.    The Facts Alleged Do Not Constitute Wire Fraud.

The elements of wire fraud are (1) a scheme to defraud, (2) money or property as the

object of the scheme, and (3) use of the mails or wires to further the scheme.  *United States v.*

*Shellef*, 507 F.3d 82, 107 (2d Cir. 2007).  Here, the Indictment fails to allege either a scheme to

defraud or money or property as the object of the scheme.  We address the money or property

element first.

1.    The Indictment Fails to Allege Money or Property as the Object of the
      Scheme.

In *Sekhar v. United States,*  the Supreme Court's majority opinion considered what it

means to "obtain[] money or property" under the Hobbs Act.  133 S. Ct. 2720, 2729 (2013).

Justices Alito, Kennedy, and Sotomayor concurred in the conclusion that the Hobbes Act did not

reach the conduct at issue, but did so by interpreting the meaning of the term "property."  Their

concurring opinion is relevant here because it shows that the fraud alleged in the Indictment does

not involve a cognizable property interest.

---

[8]    In addition to these defects, the Indictment is also defective in that:  (1) it is duplicitous
with respect to Count 1; and (2) it fails to allege a specific wire for Counts 3 and 4.  The
first deficiency is addressed in a separate motion by Dr. Kaloyeros to dismiss for
duplicity.  Dr. Kaloyeros also incorporates by reference the arguments raised in the
Motion to Dismiss of Defendants Ciminelli, Laipple, and Schuler, including that
Motion's arguments with respect to the second deficiency.

The *Sekhar* concurrence addressed whether a recommendation by an in-house government attorney to approve a transaction is property under the Hobbs Act. *Sekhar*, 133 S. Ct. at 2723. The concurring opinion concluded that it was not. *Id.* at 2728. It reasoned that:

1. The "term 'property' plainly does not reach everything that a person may hold dear; nor does it extend to everything that might in some indirect way portend the possibility of future economic gain."

2. "It is not customary to refer to an internal recommendation to make a government decision as a form of property."

3. It would be "strange to say" that the Government has a property interest in its "internal recommendations" and "even stranger to say that a private party" can obtain a property interest in the recommendation.

4. While careful not to "suggest that the concepts of property under the mail fraud statute and the Hobbs Acts are necessarily the same," the conclusion that a recommendation was not a property interest was supported by the Supreme Court's prior decision interpreting the mail fraud statute in *United States v. Cleveland*, 531 U.S. 12 (2000).

5. *Cleveland* held that a "video poker license" was not property under the mail fraud statute. That license, according to the *Sekhar* concurrence, had "a stronger claim to be classified as property than a mere internal recommendation that a state government take an initial step that might lead eventually to an investment that would be beneficial to private parties."

*Id.* at 2728–29.

While this case involves private parties and wire fraud, the same logic controls. The alleged fraud here resulted in, at most, a non-binding internal recommendation to use the Developers for future projects. This is because FSMC was not bound to use the Developers and could issue a new RFP or bypass the RFP process entirely to select a developer. As in *Sekhar*, it would be "strange to say" that a private entity's internal developer recommendation is a form of property and that a developer can acquire an interest in that property. As the *Sekhar* concurrence

- 12 -

recognized, this type of recommendation is even more tenuously classified as property than the video poker license rejected in the mail fraud context in *Cleveland*.

At bottom, the *Sekhar* concurrence provides no basis to distinguish between wire fraud and the Hobbs Act for purposes of understanding what constitutes "property." Indeed, it expressly juxtaposed the two. The Indictment's allegations do not meet the test laid out by *Sekhar*'s concurrence for property in either context and should therefore be dismissed.

2.     The Indictment Fails to Allege a Scheme to Defraud.

The Indictment also fails to allege a scheme to defraud.

First, the Indictment fails to allege that Dr. Kaloyeros contemplated actual harm or injury to FSMC, as is required to allege a scheme to defraud. *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015). Here, there is no allegation that Dr. Kaloyeros' alleged actions impacted FSMC's subsequent negotiations for a contractor to perform specific construction projects. There is no allegation that FSMC got anything other than what it bargained for when it selected the Developers as "preferred developers." And there is no allegation in the Indictment that Dr. Kaloyeros' conduct gave rise to a potential harm to FSMC since the "preferred developer" status did not entitle the Developers to any payments from FSMC, and FSMC's negotiations with the Developers for actual construction projects were entirely separate from the "preferred developer" RFP process.

Under these circumstances, the Indictment has only alleged intent to cause a "metaphysical" harm, and therefore must be dismissed. *United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006) (finding Government had failed to show intent to harm where there was no evidence that an essential element of the bargain was compromised); *United States v. Starr*, 816 F.2d 94, 100 (2d Cir. 1987) (finding no intent because any harm was "metaphysical"); *United*

*States v. Kurtz*, No. 04-CR-0155A, 2008 WL 1820903, at *3 (W.D.N.Y. Apr. 21, 2008) (dismissing indictment for failure to allege deprivation of property).

Second, to the extent the Government is proceeding on the "right to control" theory, the Indictment was required, and failed, to allege materiality. Rather than claim that FSMC was deprived of tangible money or property, the Government is likely to argue that FSMC's decision-making process was impacted by purportedly false information. This theory of wire fraud has been dubbed the "right to control" theory because it is based on the victim being deprived of information necessary to make discretionary economic decisions, and thereby its right to control its assets. *United States v. Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998). This theory requires that the information at issue be material, *i.e.* it must be "of some independent value or must bear on the ultimate value of the transaction." *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994).

Here, there is no allegation that the alleged misrepresentation about whether the RFP process for "preferred developer" status was open and competitive could or did affect the quality, adequacy, price, or nature of the bargain in the separate and distinct contracts that FSMC ultimately entered into with the Developers. *United States v. Regent Office Supply*, 421 F.2d 1174, 1182 (2d Cir. 1970). Instead, the Indictment at best alleges that the "preferred developer" bidding process was one that FSMC might have wished to avoid. This sort of allegation involving a "lack of information that might have an impact on the decision regarding where government money is spent, without more," is not sufficient. *Mittelstaedt*, 31 F.3d at 1217. In *United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007), the Second Circuit recognized:

> Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their

completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes.

*Id.* at 108. This deficiency merits dismissal of the Indictment.

Accordingly, the Indictment should be dismissed for failure to allege a scheme to defraud under either a basic wire fraud or "right to control" theory.

     B.    <u>The RFPs Themselves Indisputably Show That No Fraud Occurred.</u>

Because the Government has made a full proffer of the facts it intends to prove regarding the Complaint's claim that the RFPs were tailored, this Court may test the sufficiency of the Indictment's allegations supporting that claim. There can be no dispute that there was no tailoring and therefore no fraud here. This is because a plain examination of the RFPs that were ultimately issued demonstrates that they contained vanilla terms that were not tailored to favor any particular entity.

First, the notion that the RFPs were "tailored" is belied by the fact that the two RFPs were highly generic and substantively identical. The RFPs broadly called for the submission of pertinent information concerning the responding developers. And it is unclear how substantively identical RFPs (which the evidence will show were used in many other unrelated projects to select a number of other developers) could be uniquely tailored to exclusively favor two <u>different</u> developers.

Second, none of the supposedly tailored terms that were ultimately in the RFPs would "favor" any specific developer. They instead favored a qualified developer. The Government claims two terms were inserted to favor the Syracuse Developer: the software provision and the amendment to permit a letter of reference in place of audited financials (*see supra* at 7). The RFPs' software provision appropriately sought information as to whether the respondents had tools to assist in the management of FSMC's large and highly sophisticated projects; it did not

mandate that any developer have the software listed on the Syracuse Developer's qualifications sheet. The change to permit a letter of reference as an alternative to audited financials was also logical, insofar as audited financials might be stale. In any event, far from being exclusionary, the provision opened the process to <u>more</u> potential developers.

The Government cites to only one provision that was ultimately in the RFP that supposedly favored the Buffalo Developer—the WMBE provision. But that provision appropriately called for a demonstrated commitment to WMBE enterprise, a goal that has been recognized as laudable throughout our country, and one that FSMC itself was focused on more broadly beyond the Buffalo and Syracuse projects. Moreover, it did so at a level that was consistent with: (1) the standards employed by Fuller Road Management Corporation ("FRMC")—a similar development entity to FSMC that shared common board members, including Dr. Kaloyeros, with FSMC; and (2) the prevailing requirements of the Empire State Development Corporation ("ESDC"), which was the funding source of these projects.[9]

Third, the temporary inclusion of a 50-year provision in the Buffalo RFP cannot be the basis for a tailoring claim. The 50-year provision is not alleged to be in the Syracuse RFP. With respect to the Buffalo RFP: (1) the provision was not visible to any of the contractors who expressed an interest in the Buffalo RFP until they signed a non-disclosure form and requested and received a copy of the RFP, (2) the provision was corrected before any awards were granted; and (3) its initial inclusion cannot support an inference of fraudulent intent given the correction

---

[9]     On May 29, 2013, FRMC's Vice President for Finance and Fiscal Management sent an e-mail to Dr. Kaloyeros describing a 23% MWBE participation requirement for a draft RFP. Dean Fuleihan, then the Chair of FSMC's Board of Directors, was copied on the e-mail. That e-mail is attached to the Miller Decl. as Exhibit C. On July 5, 2013, ESDC wrote to the treasurer of FRMC. That letter is attached to the Miller Decl. as Exhibit D. In the letter, ESDC offered an incentive proposal for funding that set 23% WMBE participation as its goal.

and the fact that, once the provision was corrected, the Buffalo RFP tailoring claim rests on the single WMBE provision.

At bottom, the Government cannot credibly claim that: (1) the Syracuse RFP was tailored (or even that there was an intent to tailor) as a result of the software and financials provisions; or (2) the Buffalo RFP was tailored (or even that there was an intent to tailor) as a result of the WMBE provision and an error that was corrected before it had any impact on the bidding process.

Given these facts, the Indictment should be dismissed as a matter of law.

C.     The "Right to Control" Theory Is No Longer Tenable.

In *United States v. Finazzo,* 850 F.3d 94 (2017), *additional op.*, Nos. 14-3213-cr(L), 14-3330-cr(Con), 2017 WL 922966 (2d Cir. Mar. 7, 2017), the Second Circuit upheld the vitality of the "right to control" theory. That decision was in error because it is irreconcilable with the Supreme Court's decisions in *Cleveland v. United States*, 531 U.S. 12 (2000), *Skilling v. United States*, 561 U.S. 358 (2010), and *Sekhar v. United States*, 133 S. Ct. 2720 (2013). Therefore, to the extent the Indictment relies on the "right to control" theory, it should be dismissed.[10]

1.     The Right to Control Theory Contradicts Three Supreme Court Decisions.

In *Cleveland*, the Supreme Court held that mail fraud requires that the object of the fraud "be property in the hands of the victim" and that the right to control who receives a gaming license is not property in the hands of the licensor. *Cleveland*, 531 U.S. at 15.

In *Skilling*, the Supreme Court distinguished between honest services wire fraud and traditional wire fraud. *Skilling*, 561 U.S. at 400. It recognized that, in traditional wire fraud, "the

---

[10]     We recognize that this Court is bound by the Second Circuit's decision and make this argument here to preserve the issue for appeal.

victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other" and that honest services fraud "lacked similar symmetry." *Id.* It also concluded that, outside the bribery and kickbacks contexts, honest services fraud is too vague a theory to pass constitutional muster. *Id.* at 412.

In *Sekhar*, the Supreme Court analyzed the Hobbs Act. That Act, like the wire fraud statute, contains language requiring the defendant to have sought to obtain property from another. *Sekhar*, 133 S. Ct. at 2726 (citing to the Act, which defines extortion as "the obtaining of property from another . . ."); 18 U.S.C. § 1343 ("Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises"); *McNally v. United States*, 483 U.S. 350 (1987) (rejecting interpretation of "scheme or artifice to defraud, or for obtaining money or property" as disjunctive and requiring proof that defendant sought to obtain money or property) (citation omitted); *Cleveland*, 531 U.S. at 26 (holding that *McNally*'s interpretation still applies). The Supreme Court concluded that, in the Hobbs Act context, obtaining property requires not just the deprivation, but also the acquisition, of property. *Id.* It reasoned, relying on <u>fraud</u> cases, that Congress intended to incorporate the common-law meaning of "obtain property," which requires that the property be transferrable. *Id.*

Together, these cases demonstrate that the "right to control" theory is no longer viable. The "right to control," like the decision to issue a license in *Cleveland*, is not property in the victim's hands. The "right to control" is not the mirror image of the defendant's gain, as required by *Skilling*. Moreover, it is equally amorphous and vague as the conflict of interest theory that *Skilling* rejected as unconstitutional. Indeed, almost any conflict of interest theory

can be repackaged as a "right to control" theory. Finally, the "right to control" cannot be transferred to the defendant, as the logic of *Sekhar* dictates.

The Sixth Circuit came to exactly this conclusion in *United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014). It concluded that the wire fraud statute is "limited in scope to the protection of property rights and the ethereal right to accurate information doesn't fit that description." *Id*. at 591 (citation and quotation omitted). This Court should conclude the same here and dismiss the Indictment to the extent it is premised on this theory.

2.    *Finazzo* Was Wrongly Decided.

In *Finazzo*, the Second Circuit concluded that the right to control theory survived *Sekhar*. It reasoned that the property at issue need not actually be "obtainable," thus limiting *Sekhar* to the Hobbs Act context. 850 F.3d at 105–06. This was in error.

First, *Finazzo*'s interpretation contradicts the plain language of the wire fraud statute. The statute reads in pertinent part: "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property." 18 U.S.C. § 1343. While the "or" in the statute suggests the two clauses are separate, the Second Circuit has recognized that the statute does not prohibit "two separate acts." *Finazzo*, 850 F.3d at 106. Rather, the "statute is interpreted to criminalize any scheme or artifice for <u>obtaining</u> money or property." *Id.* (emphasis added). The Second Circuit's interpretation would inappropriately read out the critical obtaining requirement. *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (recognizing reluctance to treat statutory terms as surplusage in any setting, particularly where the term occupies a central space in the statutory scheme).

Second, *Finazzo* principally leans on a 2005 Second Circuit decision, *Porcelli v. United States*, that cannot bear this weight. *See Porcelli v. United States*, 404 F.3d 157, 162 (2d Cir.

2005). In *Porcelli*, the Second Circuit began by recognizing that "obtaining" property is a critical element of the wire fraud statute. 404 F.3d at 162. It then asserted, without any analysis, that defendants need not "literally 'obtain' money or property to violate the statute." *Id.* It recognized that its own interpretation was in tension with both the rule of lenity and the rule against surplusage, but affirmed its stance based on *stare decisis*. *Id.* at 163. Whatever its merits then, that deference cannot hold given the Supreme Court's subsequent guidance in *Skilling* and *Sekhar*.

For these reasons, the Second Circuit erred in its conclusion that the "right to control" theory survives *Sekhar*.

## V.   <u>CONCLUSION</u>

When prosecutors have political goals, they produce political prosecutions. So too here. The U.S. Attorney's zeal to tarnish Governor Cuomo and bolster his own tough-on-corruption reputation has produced an Indictment that is legally and factually unsupportable. It should be dismissed.

Respectfully submitted,

/s/ Michael C. Miller
Michael C. Miller
Jeffrey A. Novack
Katherine M. Dubyak
David B. Hirsch
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900

*Counsel for Alain Kaloyeros*

Dated: May 19, 2017