

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 18, 2018

**BY ECF and EMAIL**

The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re:     *United States v. Alain Kaloyeros, et al.*, S2 16 Cr. 776 (VEC)

Dear Judge Caproni:

  The Government respectfully writes to oppose the motions *in limine* filed by defendants Alain Kaloyeros (Dkt. Nos. 636), Louis Ciminelli (Dkt. No. 631), Michael Laipple (Dkt. No. 632), Steven Aiello (Dkt. No. 634), and Joseph Gerardi (Dkt. Nos. 627, 628), respectively.

  *First*, the Government submits that it should be permitted to offer focused and limited testimony and a small number of documents about (1) Kaloyeros's rigging of an RFP in Albany to build student housing, (2) Laipple's attempt to provide input into a school-construction RFP prior to its public issuance, and (3) Aiello and Gerardi's efforts with Todd Howe to bribe the senior aide of Governor Cuomo, Joseph Percoco, as well as Aiello and Gerardi's subsequent lies about that conduct. As explained in detail below, this evidence of other acts is admissible under Federal Rule of Evidence 404(b). Clear limiting instructions will protect the uninvolved defendants from the risk of unfair spillover prejudice.

  *Second*, the Court should preclude Gerardi from mentioning or offering as evidence his acquittals in the January trial.

  *Third*, the Government should be permitted to introduce evidence of the procurement policies that the employees of Fort Schuyler Management Corporation ("Fort Schuyler") used as guidance when they conducted the Buffalo and Syracuse RFP processes. Evidence of those policies and Kaloyeros's disregard for them is admissible proof of his intent, knowledge, and lack of mistake or accident. *Fourth*, the Government should be permitted to ask fact witnesses with personal knowledge about their understandings of the meanings of emails and documents that they received. Such testimony will help the jury understand various ambiguous or fractured phrases. *Fifth*, the Government should be permitted to elicit evidence of the materiality of Kaloyeros's misrepresentations and omissions, some of which will require the use of "hypothetical" questions. *Sixth*, the Government should be allowed to offer evidence of Kaloyeros's motive, including his high salary and his desire to retain his prominent and powerful university positions.

*Seventh*, Ciminelli's motion to preclude the Government from making certain statements in its opening address should be denied as premature. In addition, Ciminelli's motions to bar the Government from arguing that the "preferred developer" status is property under the wire fraud statute, and to receive a jury instruction on New York law, should be denied.

*Eighth*, Aiello's motion to preclude evidence of COR Development and its affiliates' campaign contributions should be denied.

I. **The Court Should Admit Testimony and Evidence of Other Bad Acts of Kaloyeros, Laipple, Aiello, and Gerardi**

The Government intends to elicit focused testimony and introduce a limited number of exhibits in its case-in-chief related to certain bad acts committed by Kaloyeros, Laipple, Aiello, and Gerardi, respectively. In particular, the Government intends to prove the following:

- *First*, from in or about 2014 through 2015, less than a year after he and his co-conspirators illicitly tailored the Buffalo and Syracuse RFPs and defrauded the Fort Schuyler Board of Directors, Kaloyeros rigged a supposedly fair and competitive RFP process that sought a developer to build student housing for SUNY Poly in Albany (the "Albany RFP") and ultimately steered the RFP award to his predetermined choice. Evidence that Kaloyeros tailored the Albany RFP after he did the same to the Buffalo and Syracuse RFPs is important proof of his opportunity, intent, knowledge, absence of mistake, and lack of accident. *See* Rule 404(b)(2).

- *Second*, in or about early 2013, Laipple and Howe attempted to obtain a draft of the RFP for the construction of Syracuse public schools before the RFP's public issuance. Those unsuccessful efforts occurred at the start of the Buffalo Developer's relationship with Howe, approximately eight months before Laipple and the other defendants at the Buffalo Developer got their hands on a draft of the Buffalo RFP and had an opportunity to insert terms favorable to their company. This evidence is admissible under Rule 404(b)(2) to establish Laipple's intent, knowledge, absence of mistake, and lack of accident. *See* Rule 404(b)(2).

- *Third*, as the Court is well aware, in or about 2014 through 2015, Aiello and Gerardi corruptly paid Percoco approximately $35,000 in exchange for Percoco taking official actions to benefit COR Development. Those bribe payments were facilitated by Howe, who was retained as COR's lobbyist. During the January trial, both Aiello and Gerardi repeatedly argued to the jury that they had been duped by Howe and thus were not guilty of the charged bribery offenses. Moreover, Gerardi's counsel represented on the record that, at the June trial, he would again argue that Gerardi was tricked by Howe. Evidence of Aiello and Gerardi's continued corrupt dealings with Howe many months after the three of them worked to rig the Syracuse RFP will undermine their claim that Howe tricked them and that, as a result, they lacked any criminal intent. *See id.*

For the reasons set forth below, the Government should be permitted to offer limited testimony and evidence of these specific bad acts.

## A. Applicable Law

Evidence of other bad acts is admissible under Rule 404(b)(2) and 403 if it (1) is advanced for a proper purpose; (2) is relevant to a material issue at trial; (3) has probative value that is not substantially outweighed by any unfair prejudicial effect; and (4) is admitted subject to a limiting instruction, if one is requested. *See, e.g.*, *Huddleston v. United States*, 485 U.S. 681, 691 (1988); *United States v. Brand*, 467 F.3d 179, 196 (2d Cir. 2006); *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004). Permissible purposes for introducing evidence of other acts include "proving motive, opportunity, intent, . . . knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). In addition, other act evidence is admissible to establish "background information" to a charged conspiracy and to explain how a criminal relationship developed. *United States v. Pipola*, 83 F.3d 556, 565 (2d Cir. 1996). Other act evidence is also admissible to help the jury understand the basis for the relationship of mutual trust between co-conspirators. *See, e.g.*, *United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993).

The Second Circuit follows "an 'inclusionary' approach to other act evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity." *LaFlam*, 369 F.3d at 156; *accord United States v. Thomas*, 54 F.3d 73, 82 (2d Cir. 1995) (allowing evidence of defendant's prior conviction on charge of transporting stolen money orders where it demonstrated knowledge and intent with respect to money orders at issue in case at bar); *United States v. Gelzer*, 50 F.3d 1133, 1139-40 (2d Cir. 1995) (allowing circumstantial evidence from prior unrelated and uncharged robbery where it established defendant's connection to a weapon used in the charged crime).

The admission of extrinsic evidence concerning a defendant's prior conduct is particularly appropriate where the defendant's state of mind is at issue:

> Federal Rule of Evidence 404(b) . . . generally prohibits the introduction of extrinsic acts that might adversely reflect on the actor's character, unless the evidence bears upon a relevant issue in the case such as motive, opportunity, or knowledge. Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct.

*Huddleston*, 485 U.S. at 685. The Second Circuit has repeatedly held that "[w]here intent to commit the crime charged is clearly at issue, evidence of prior similar acts may be introduced to prove that intent." *United States v. Caputo*, 808 F.2d 963, 968 (2d Cir. 1987). The defendant's knowledge and intent is at issue unless the defendant unequivocally concedes that element of the offense. *See, e.g.*, *United States v. McCallum*, 584 F.3d 471, 475-76 (2d Cir. 2009) ("Because [the defendant's] counsel did not make a statement to the court of sufficient clarity to indicate that intent and knowledge would not be disputed, those issues remained sufficiently in dispute for the similar acts evidence to be relevant and hence admissible."); *United States v. Colon*, 880 F.2d 650,

656-57 (2d Cir. 1989) ("If a defendant does not wish to enter into a formal stipulation, he or she must at least 'express a decision' to restrict the defense case so as not to raise the issue of intent, and to accept a jury instruction that would keep that issue out of the case.").

Where evidence is offered for a proper purpose under Rule 404(b), the Court may only exclude the evidence under Rule 403 if the probative value of the evidence is "substantially outweighed" by the danger of unfair prejudice. *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993). With regard to the prejudice prong, evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). Moreover, Rule 403 does not bar evidence of other acts that "did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged." *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also United States v. Barris*, 377 F. App'x 93, 96 (2d Cir. 2010) (stating that admission of evidence under Rule 404(b) is not contrary to Rule 403 where the "evidence was not inflammatory, pejorative, or otherwise unfairly prejudicial, and had obvious probative value"). All relevant evidence is to some degree prejudicial; unfair prejudice means, however, an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Rule 403, Advisory Comm. Note. Traditional examples of unfair prejudice include evidence that appeals to the jury's sympathies, evidence that arouses jurors' sense of horror, and evidence that provokes a jury's instinct to punish. *United States v. Herron*, No. 10 Cr. 615 (NGG), 2014 WL 1871909, at *4 (E.D.N.Y. May 8, 2014). A "[d]efendant must show some undue prejudice, apart from the prejudice implicit in Rule 404(b) evidence." *United States v. Vargas*, 702 F. Supp. 70, 72-73 (S.D.N.Y. 1988).

Finally, with respect to the timing of the Government's presentation of the proffered evidence, the Second Circuit has made clear that where it is apparent that knowledge or intent will be in dispute, "evidence of prior or similar acts may be introduced during the government's case-in-chief, 'rather than waiting until the conclusion of the defendant's case.'" *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (quoting *Caputo*, 808 F.2d at 968); *see also Zackson*, 12 F.3d at 1183 ("[T]he nature of [defendant's] defense was apparent from the outset of the trial; thus, there was no need to await [defendant's] testimony."); *United States v. Inserra*, 34 F.3d 83, 90 (2d Cir. 1994) ("[A]dmission of similar act evidence to prove intent or knowledge . . . is admissible during the Government's case-in-chief if it is apparent that the defendant will dispute that issue.").

## B. Kaloyeros's Efforts to Rig the Albany RFP

The Government will prove at trial that Kaloyeros purposefully tailored the Buffalo and Syracuse RFPs and implemented procedural hurdles that simultaneously helped his favored developers and prevented other qualified companies from submitting bids. But he did not stop there.[1] About a year later, he manipulated a third RFP to again steer the award to a favored

---

[1]

construction company based in Albany (the "Albany Developer"). Proof of that subsequent misconduct establishes that Kaloyeros, in his powerful roles as the head of CNSE, as well as the *de facto* leader of Fort Schuyler and its Albany-equivalent ("Fuller Road"), had the opportunity to rig the Buffalo and Syracuse RFPs. Moreover, the Albany RFP evidence will show that Kaloyeros's manipulation of prior RFPs was neither a mistake nor an accident, but instead was an intentional effort to rig those supposedly fair competitions and deceive the independent Fort Schuyler Board. These purposes are all grounds for admission of evidence under Rule 404(b)(2).

The relevant facts are as follows: In or about mid-2014, the Albany Developer began purchasing numerous houses on land adjacent to the Albany campus of SUNY Poly. As his company quietly amassed a large plot of land right next to the university, the president of the Albany Developer ("Individual-1") forwarded numerous internal email updates about those acquisitions to Kaloyeros's personal email account. For example, on or about October 30, 2014, Individual-1 forwarded Kaloyeros an email with the subject line "RE: 11 Loughlin [Street] signed Contract – CNSE Student Housing Project." Eventually, on or about January 22, 2015, Individual-1 forwarded to Kaloyeros another "Loughlin Street Update" about a particular housing plot that was, in Individual-1's words, the "[l]ast house."

Less than a month later, Individual-1 asked Kaloyeros to review a draft letter that stated, in part, "Please accept this unsolicited proposal to develop a new student housing facility. . . . [W]e propose a three phase development project described below to include (i) Phase 1 – construction of 103 bed student housing facility and 430 car parking; (ii) Phase II – construction of 180 bed student housing facility and (iii) Phase III – construction of an 800 car parking garage . . . ." Two days later, on or about February 20, 2015, Kaloyeros instructed his employees that it was "[t]ime to prepare an RFP for student housing[.] A 3 phase plan with 100 beds, then 250 beds, then 500 beds[.] Need to be in close proximity (preferably walking distance) to SUNY Poly CNSE[.]" Kaloyeros forwarded that internal order to Individual-1.

Fuller Road issued the Albany RFP in or about March 2015. The RFP required the student housing to be "adjacent" to campus, which effectively ruled out any proposal except for Individual-1's given the location of the houses purchased by the Albany Developer. During the drafting process, an employee tweaked that language to read "approximate" to campus in order to permit greater competition, but Kaloyeros instructed him to change the word back to "adjacent." The project was awarded to the Albany Developer in or about September 2015.

This evidence related to the Albany RFP is admissible in the Government's case-in-chief because opportunity, knowledge, and intent will be disputed issues at trial.[2] *See Caputo*, 808 F.2d at 968 (When "intent to commit the crime charged is clearly at issue, evidence of prior similar acts may be introduced to prove that intent."). Kaloyeros has argued in prior motions that the Buffalo

---

[2] The Government is not seeking to introduce the Albany RFP evidence as proof of Kaloyeros's plan or modus operandi. *Cf.* Kaloyeros MIL 17, 20; *United States v. Herman*, 589 F.2d 1191, 1198 (3d Cir. 1978) (evidence precluded under Rule 403 because it did not prove modus operandi) (cited by Kaloyeros MIL 20).

and Syracuse RFPs were not rigged because "they contained vanilla terms that were not tailored to favor any particular entity." (Dkt. No. 177 at 15.)  In fact, he contends that even certain qualifications suggested by his co-conspirators did not "'favor' any specific developer," but "instead favored a qualified developer." (*Id.*)  Furthermore, the Government anticipates that a number of witnesses will testify that Kaloyeros told each of them that the 50-year experience requirement in the Buffalo RFP was a typographical error, rather than a purposeful qualification. In view of Kaloyeros's past assertions, the Government anticipates that he will argue that, when he decided to add the qualifications to the Buffalo and Syracuse RFP, he did not have the intent to tailor those documents.  To the contrary, his mens rea was to create a RFP that would identify the best, most qualified developer.  With respect to the 50-year requirement, the Government expects that Kaloyeros will contend that he did not intend to require so many years of experience.

Kaloyeros's tailoring of the Albany RFP to favor the Albany Developer will establish that he had the opportunity to edit and review the Buffalo and Syracuse RFPs.  As noted above, documents that the Government will offer at trial show that Kaloyeros, in response to questions from his employees and the press, asserted that the Buffalo RFP initially required 50 years of experience because of a typographical error rather than a deliberate attempt to favor the Buffalo Developer.  Furthermore, Kaloyeros did not take responsibility for that "error."  Based on those documents, the Government anticipates that Kaloyeros may argue at trial that he did not insert the 50-year requirement and did not participate in the drafting of the RFP.  The Albany RFP evidence, however, proves that Kaloyeros had the opportunity, as the nominal head of Fort Schuyler and Fuller Road, to edit, review, comment, and sign-off on RFPs, and indeed, drafted and closely reviewed and edited the RFPs published by Fort Schuyler and Fuller Road on behalf of CNSE. *See, e.g.*, *United States v. Maravilla*, 907 F.2d 216, 222 (1st Cir. 1990) ("To show 'opportunity' is to show that the defendant had some special capacity, ability or knowledge that would enable him to commit the crime."); *cf. United States v. Robinson*, 560 F.2d 507, 513 (2d Cir. 1977) (en banc) (finding that defendant's "possession of the gun was also admissible under [Rule 404(b)] on the independent ground that it tended to show he had the 'opportunity' to commit the bank robbery, since he had access to an instrument similar to that used to commit it"); *United States v. Taylor*, 767 F. Supp. 2d 428, 438 (S.D.N.Y. 2010) (same).  In turn, that proof (along with additional documents and testimony specifically about the Buffalo and Syracuse RFPs) will tend to establish that Kaloyeros was responsible for the developer-specific qualifications in the RFPs.

The Albany RFP evidence will also be proof that his inclusion in the Buffalo and Syracuse RFPs of the qualifications proposed by his co-conspirators was neither well-intentioned nor a mistake or accident.  "When 'other act' evidence is offered to show knowledge or intent in particular . . . such evidence must be 'sufficiently similar to the conduct at issue' to permit the jury to draw a reasonable inference of knowledge or intent from the other act." *United States v. Cadet*, 664 F.3d 27, 32 (2d Cir. 2011).  However, the uncharged conduct "need not need not be identical to the charged conduct to show knowledge or intent pursuant to Rule 404(b), so long as the evidence is relevant in that it provides a reasonable basis for inferring knowledge or intent." *Id.* In the instant case, Kaloyeros's conduct on the Albany RFP is "sufficiently similar" to his actions on the Buffalo and Syracuse RFPs a year earlier.  Specifically, Kaloyeros deliberately inserted requirements into the Albany RFP that favored his chosen developer.  Because Kaloyeros knew that the Albany Developer had purchased land next to the university, he wrote the RFP to require the housing to be built "adjacent" to campus. Kaloyeros also required a three-phase project, which

mirrored the proposal of Individual-1.  Furthermore, like in Buffalo and Syracuse, Kaloyeros identified and worked with his pre-selected developer prior to the public issuance of the RFP.

Kaloyeros contends that the Albany RFP is not similar enough to the Buffalo and Syracuse RFPs to be admissible to prove intent or knowledge.  (Kaloyeros MIL 18.)  For example, Kaloyeros points out that the Albany RFP related to student housing whereas the other RFPs sought a preferred developer.  (*Id.*)  But those differences, which focus on the end result of the RFPs, are irrelevant to the issue of whether Kaloyeros's unfair drafting of the Albany RFP was sufficiently similar to his charged conduct to support an inference of intent.  The evidence will show that Kaloyeros repeatedly tailored RFPs.  The clear inference is that he intentionally inserted into the Buffalo and Syracuse RFPs the qualifications that were beneficial to his favored developers.  Similarly, the Albany RFP evidence also supports the inference that Kaloyeros did not make a mistake, but instead purposefully inserted the 50-years requirement to favor the Buffalo Developer.  *See Caputo*, 808 F.2d at 968; *Cadet*, 664 F.3d at 33 ("Evidence that [the defendant] knowingly and intentionally prepared a false tax return for [an undercover agent] by inserting inflated deductions on the Form 1040 thus provided a reasonable basis to infer that the inflated deductions that formed the basis for the 16 counts of conviction were likewise entered knowingly and intentionally."); *United States v. Alcantara*, 674 F. App'x 27, 30 (2d Cir. 2016) ("Because of the similarities between Alcantara's prior conviction and the present facts . . . Alcantara's prior experiences are probative of both her knowledge that it was unlawful to use another's means of identification to process fraudulent tax returns and her intent to use fake means of identification to steal government property.").

Kaloyeros also contends that the Albany RFP evidence should be precluded under Rule 403 because it is unfairly prejudicial propensity evidence.  He is wrong.  The Albany RFP evidence is highly probative as to Kaloyeros's intent, knowledge, and lack of mistake or accident and will be offered for those purposes.[3]  On the other side of the Rule 403 ledger, the Albany RFP evidence

---

[3] Kaloyeros relies on *United States v. DiCarlo*, where the district court barred the government from presenting evidence that the defendants, who were charged with rigging municipal bids for produce contracts, had also rigged bids for grocery contracts around the same time period.  131 F. Supp. 2d 537, 538-39 (S.D.N.Y. 2001).  The district court determined that offering evidence of the grocery contracts was "nothing more than another thinly-guised attempt to materially vary from the indictment," which alleged rigging of produce and frozen food contracts but not grocery contracts (all three types of contracts were bid by the same municipal entity).  *Id.* at 539.  That certainly is not the case here.  The Government has not and does not allege that Kaloyeros's tailoring of the Albany RFP was part of the wire fraud conspiracy charged in the S2 Indictment.  Indeed, that conduct occurred about a year later and involved several other people but none of the other defendants.  Thus, admission of the Albany RFP evidence will not open the door to a prejudicial variance of the indictment, as the *DiCarlo* court feared.  *Cf. id.*

*DiCarlo* is inapposite for another reason: Those defendants affirmatively conceded that "the usual issues of background, knowledge, and intent are not materially involved in this case because the only genuine issue in the case is whether they agreed to an illicit proposal to rig bids allegedly made by [a] conspirator," which obviated the government's need for Rule 404(b) evidence to prove the defendants' intent.  *Id.* at 539 n.2.  As explained above, Kaloyeros and his co-defendants have already made clear that they intend to vigorously contest their intent to commit

is no more sensational or disturbing than the bid rigging offenses charged in the indictment. In this circumstance, a limiting instruction will sufficiently minimize the risk of unfair prejudice. *See United States v. Jimenez*, 586 F. App'x 50, 53 (2d Cir. 2014) ("Undue prejudice is minimized where, as here, 'the evidence did not involve conduct more serious than the charged crime and the district court gave a proper limiting instruction.'" (quoting *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000))). Accordingly, the Rule 403 balancing test clearly weighs in favor of admitting the Albany RFP evidence.

### C. Laipple's Attempt to Obtain the Syracuse Schools RFP Early

For similar reasons, the Government should be permitted to introduce evidence of Laipple and Howe's attempt to obtain a draft of the RFP for Syracuse public school construction projects prior to its public issuance. The Government expects to prove that, in or about January 2013, Laipple and Howe met with the then-mayor of Syracuse (the "Mayor") and discussed an upcoming RFP for program manager services in connection with Syracuse schools construction. Following that meeting, Laipple sent an email to the Mayor that suggested draft language to include in the RFP. Sometime later, Howe called the Mayor and stated, in substance and in part, that Laipple could look at the RFP prior to its public issuance and put in terms to make the RFP more efficient and to ensure that the RFP was not missing anything.

As with the use of the Albany RFP evidence against Kaloyeros, Laipple's conduct in offering to provide qualifications for the Syracuse schools RFP (and Howe's attempt to get the draft RFP early) is similar to his conduct with respect to the charged offenses. Thus, the evidence of the schools RFP is highly probative as to Laipple's knowledge and intent when he provided qualifications in bullet point form to Howe for inclusion in the Buffalo RFP. (Compl. ¶ 79(b), (d).) It is appropriate for the Government to introduce this other act evidence in its case-in-chief as proof of Laipple's intent, knowledge, and lack of mistake or accident.

Laipple counters with various objections to the factual allegations provided by the Government. (Laipple MIL 5-6.) But his mere assertion that he has a different understanding of the facts is not a basis for precluding the evidence. Laipple will have the opportunity to share his view of what happened through cross examination and his own testimony, if he chooses.

### D. Aiello and Gerardi's Bribery of Joseph Percoco

The Government seeks to introduce evidence at trial regarding Aiello and Gerardi's payment of bribes to Joseph Percoco, a senior aide to the Governor, in exchange for Percoco's action and influence on matters before the State. The charges related to that bribery scheme were tried in January 2018, and, of relevance here, the jury found Aiello guilty of conspiring to commit honest services wire fraud but not guilty of paying bribes and making false statements, and acquitted Gerardi of all charges.[4] The Government intends to offer limited and focused testimony

---

the charged offenses. As a result, the Government is entitled to offer other-act evidence under Rule 404(b)(2) in its case-in-chief to prove intent. *See Pitre*, 960 F.2d at 1120.

[4] Gerardi does not argue that his acquittal, alone, bars the admission of evidence of his involvement in the Percoco bribery scheme under Rule 404(b). Nor could he: Any "argument that

and exhibits to prove that Aiello and Gerardi conspired with Howe in or about mid-2014 to bribe Percoco, and that the defendants lied to federal officers about that illicit conduct in 2016.[5] The Percoco bribery scheme, which occurred nearly a year after the rigging of the Syracuse RFP, is probative of Aiello and Gerardi's intent when they worked with Howe in mid-2013.

Gerardi argues that evidence of the Percoco bribery scheme would be improper propensity evidence and thus inadmissible. He further contends that the Percoco bribery scheme is too dissimilar to the RFP bid rigging to be probative as to his intent. (Dkt. No. 627 ("Gerardi 404(b) MIL") 3-4.) He is wrong on both counts. The Government will introduce the Percoco bribery evidence to prove Aiello and Gerardi's knowledge, intent, and lack of accident or mistake at the time they worked with Howe and Kaloyeros to tailor the Syracuse RFP; those purposes are proper, non-propensity grounds for admission of the evidence under Rule 404(b)(2). It is clear that intent will be the central issue at trial. Gerardi's counsel represented to the Court that Aiello and Gerardi's defense "theory" in this case will be that they were "duped with regard to the Buffalo Billions, which is what we argued in the motion to dismiss." (Jan. Trial Tr. 5241.) Counsel later reaffirmed that the defense was that "we were duped both times" by Howe. (*Id.* at 5250.)

Evidence that the Syracuse Defendants continued to work with Howe and indeed engaged in a second corrupt scheme with him about a year after the tailoring of the Syracuse RFP is admissible proof that Aiello and Gerardi were not "duped" but rather were willing participants in the RFP bid rigging. In fact, the Court already determined that evidence of the bid rigging and the Syracuse Defendants' retainer and bonus payments to Howe "tends to undercut the claim that COR retained Howe only for legitimate business purposes" and "makes it less probable that the 35,000 in payments [to Percoco] were part of a pattern of good faith above consulting fees and thus more probable that they understood that they were paying the bribe." (*Id.* at 5284.) The reverse is also true. The fact that Aiello and Gerardi knowingly engaged in a second bad act with Howe is evidence tending to undermine their claim that, a year earlier, they had but a mere lawful consulting relationship with Howe, in the course of which they were duped.

Gerardi also exaggerates the differences between the bid rigging and Percoco bribery schemes. "Courts within the Second Circuit have frequently allowed the admission of 'other act' evidence pursuant to Rule 404(b) to prove knowledge and intent when such other acts are similar to the crime with which a defendant stands charged, particularly in the context of crimes of fraud." *United States v. Alcantara*, No. 13 Cr. 119 (LTS), 2015 WL 13215025, at *3 (S.D.N.Y. Jan. 28, 2015), *aff'd*, 674 F. App'x 27 (2d Cir. 2016). For example, proof that the two defendants participated in previous credit card schemes with each other was properly admitted to show intent of the charged conspiracy to commit access device fraud. *See Caputo*, 808 F.2d at 965, 968; *see*

---

his acquittal on the prior charges somehow makes them inadmissible, or, at least, less probative, is foreclosed by the Supreme Court's decision in *Dowling v. United States*, 493 U.S. 342, 348 (1990). In *Dowling*, the Court held that otherwise admissible prior-act evidence is admissible under Rule 404(b), regardless whether it relates to alleged criminal conduct for which the defendant was acquitted." *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 172 (S.D.N.Y. 2006).

[5] The Government expects to present a limited number of emails and elicit testimony from a law enforcement agent and a former State official (both of whom will testify about the charged conduct as well).

*also United States v. Mills*, 895 F.2d 897, 907 (2d Cir. 1990) (evidence of prior counterfeiting conviction properly admitted to prove intent for charged possession of counterfeit money); *United States v. Myerson*, 18 F.3d 153, 166-67 (2d Cir. 1994) (upholding admission of prior instances of fraudulent diversion of client funds and tax evasion to prove intent for those crimes); *United States v. Pitre*, 960 F.2d 1112, 1117, 1119 (2d Cir. 1992) (evidence of involvement in other drug crimes with same co-conspirators properly admitted as evidence of knowledge of charged drug conspiracy).

Here, the common strands linking the two bad acts include fraud, dishonesty, and concealment. The charged RFP conspiracy involved Aiello and Gerardi's secret and dishonest insertion of terms into the RFP, their deceptive efforts to benefit COR Development, and their concealment of large bribe payments to Howe, who was acting as an agent of the State. The Percoco bribery bad act similarly involved Aiello and Gerardi's payment of bribes to a State agent, concealed through the use of Howe as a pass-through, and their secret efforts to secure lucrative benefits for COR Development. Notably, the defendants engaged in both fraudulent schemes with Howe. Moreover, the two schemes overlapped: After he was paid, Percoco helped to push through back-logged State funds owed to COR Development for the film hub project, which was awarded through the Syracuse RFP process. Accordingly, the Percoco bribery conduct is sufficiently similar to the charged conduct to be admissible to prove intent pursuant to Rule 404(b).

Finally, Gerardi is wrong that the Percoco bribery evidence is unfairly prejudicial and should be barred under Rule 403. Gerardi cites the Government's prior agreement to sever of the RFP-related charges from the Percoco bribery-related charges. (Gerardi 404(b) MIL 4.) But the limited and narrow presentation of the Percoco bribery evidence proposed here will not undermine the benefits of the severance ordered by the Court. The Government anticipates testimony from one or two witnesses to establish the role of Percoco and the State-related problems with which the defendants needed assistance and to explain the defendants' false statements, as well as a handful of exhibits showing the bribe payments and the defendants' repeated requests to Howe for Percoco's assistance. The Government, of course, will not need to introduce all the evidence necessary to prove the charges that were already tried in January. As a result, the Percoco bribery evidence will not be unfairly prejudicial, and will not result in a "mini-trial."

Gerardi also speculates that, after hearing the Percoco bribery evidence, the jury may wonder why he "was not tried for the Percoco Bribery Scheme, and be inclined to convict on the Buffalo Billion allegations, even in the absence of sufficient proof, for fear that he will get away with the alleged bribery."[6] (Gerardi 404(b) MIL 5.) His concern is unfounded. The jury will be charged that they are not to consider defendants or charges not included in the trial before them, and juries are presumed to follow the Court's instructions. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (recognizing "the almost invariable assumption of the law that jurors follow their instructions"). In addition, the Percoco bribery evidence, while highly probative of the defendants' intent and knowledge, is no more sensational or disturbing than charges relating to colluding with a State university president to rig bids for State construction contracts worth tens of millions of

---

[6] Gerardi also contends that admission of the Percoco bribery evidence is unfairly prejudicial because it would force him to defend himself again. (Gerardi 404(b) MIL 5.) That same argument was made and rejected by the Supreme Court in *Dowling*. *See* 493 U.S. at 354.

dollars. *Roldan-Zapata*, 916 F.2d at 804. Because the probative value of the Percoco bribery evidence is not outweighed by risk of unfair prejudice, the Government should be permitted to offer that evidence in its case-in-chief.[7]

_____

[7] Regardless of the admissibility of the Percoco bribery evidence in the Government's case-in-chief, the Government should be permitted to cross-examine Aiello or Gerardi, and to introduce rebuttal evidence, regarding the Percoco bribery scheme if either defendant, through his counsel's statements to the jury or cross-examination of witnesses, argues that he had a legitimate relationship with Howe and was somehow duped by him into rigging the Syracuse RFP. *See, e.g.*, *Alcantara*, 2015 WL 13214927, at *4 ("The Court agreed that defense counsel had made statements that put Defendant's knowledge and intent with respect to both counts squarely at issue . . . ."); (Jan. Trial. Tr. 5284 ("[T]he Buffalo Billions evidence is fair rebuttal to Aiello's and Gerardi's portrayal of the history of their relationship with Howe.")).

However, if Gerardi has not asserted at trial—either personally or through counsel—that he only had a legitimate relationship with Howe and was duped by Howe to commit the charged offenses, the Government will not seek to cross-examine him about the Percoco bribery scheme under Rule 608(b) if he decides to testify. *United States v. Schwab*, 886 F.2d 509, 513 (2d Cir. 1989).

With respect to Aiello, even if he does not open the door to rebuttal evidence about the Percoco bribery scheme, the Government should be permitted pursuant to Rule 609 to impeach him by admitting evidence of his conviction in the January trial if he decides to testify. Rule 609 provides that, for a felony conviction, "the evidence must be admitted in a criminal case in which the witness is a defendant, if the probative value of the evidence outweighs its prejudicial effect to that defendant." Fed. R. Evid. 609(a)(1)(B). Aiello's conviction may also be admissible on the independent ground that it is a crime involving dishonesty under Rule 609(a)(2). *See United States v. Williams*, 642 F.2d 136, 140 (5th Cir. 1981) (state bribery conviction admissible under Rule 609(a)(2) because "bribery is a crimen falsi in that it involves dishonesty"). The fact that Aiello has not been sentenced does not bar the admission of evidence of the conviction. *See United States v. Vanderbosch*, 610 F.2d 95, 97 (2d Cir. 1979). In sum, the Government will offer the "essential facts" of Aiello's conviction, namely, the statutory name of the offense (*i.e.*, conspiracy to commit honest services wire fraud) and the date of conviction. *See United States v. Estrada*, 430 F.3d 606, 615 (2d Cir. 2005).

Furthermore, even if Aiello does not open the door, the Government may properly cross-examine him about his involvement in the Percoco bribery scheme under Rule 608. That Rule provides, in relevant part, that "the court may, on cross-examination, allow" specific instances of a witness's conduct "to be inquired into if they are probative of the character for truthfulness or untruthfulness of the witness[] or another witness whose character the witness being cross-examined has testified about." Fed. R. Evid. 608(b)(1)-(2). Aiello's participation in the payment of bribes to Percoco in exchange for assistance with State-related issues, as well as his false statements about that conduct, are directly relevant to his character for untruthfulness and deception, and thus constitutes quintessential impeachment material. *See, e.g.*, *United States v. Sampson*, No. 13 Cr. 269 (DLI), 2015 WL 2066073, at *13 (E.D.N.Y. May 4, 2015) (permitting cross-examination with respect to certain deceitful acts because the "incidents clearly go to Defendant's character for truthfulness as they all involve incidents where Defendant may have lied

**E. The Limited and Narrow Presentation of the Proposed Rule 404(b) Evidence Will Not Lead to Unfair Spillover Prejudice Against Kaloyeros and Ciminelli**

Kaloyeros and Ciminelli advance the additional argument that admission of certain Rule 404(b) evidence against other defendants will substantially increase the risk of spillover prejudice to themselves. Kaloyeros moves to preclude that evidence, while Ciminelli moves to sever his trial in the event the Court admits that evidence. Those motions should be denied.

As explained in the Government's brief in opposition to the defendants' pretrial motions, "[e]ven if prejudice is shown . . . severance is not necessarily required" under Federal Rule of Criminal Procedure 14 because, "even when the risk of prejudice is high, measures less drastic than severance, 'such as limiting instructions, often will suffice to cure any risk of prejudice.'" *United States v. Diaz*, 176 F.3d 52, 104 (2d Cir. 1999) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)); *see also United States v. Spinelli*, 352 F.3d 48, 56 (2d Cir. 2003) ("[E]ven the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance."); *United States v. Taveras*, No. 95 Cr. 173 (AGS), 1995 WL 390167, at *7 (S.D.N.Y. June 30, 1995) ("Simply put, '[e]vidence of prior criminal offenses relating only to one defendant does not generate prejudice rising to the level that requires severance.'" (quoting *United States v. Salomon*, 609 F.2d 1172, 1175 (5th Cir. 1980))).

Here, the elevated risk of prejudice can be successfully mitigated with limiting instructions that, in sum and substance, inform the jury that (1) the Albany RFP conduct can only be used against Kaloyeros, (2) the Laipple attempt can only be used against Laipple, and (3) the Percoco bribery evidence can only be used against Aiello and Gerardi. Courts regularly issue limiting instructions in multi-defendant trials that guide the jury as to what evidence can and should be considered against some defendants, but not others. *See, e.g.*, *United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002) ("Absent evidence to the contrary, we must presume that juries understand and abide by a district court's limiting instructions."); *United States v. Griffin*, No. 94 Cr. 631 (AGS), 1996 WL 140073, at *13 (S.D.N.Y. Mar. 27, 1996) ("The Second Circuit has routinely found that juries will abide by limiting instructions in multi-defendant cases.").[8]

---

or misrepresented facts in order to induce others to act"); *United States v. Browne*, 621 F. App'x 44, 48 (2d Cir. 2015) (finding the District Court did not abuse its discretion in "permitting cross-examination about [the defendant's] alleged participation in a prior fraudulent real estate transaction" to probe her credibility where the defendant had testified on direct that "she was an unknowing participant in the mortgage fraud scheme at issue in the case").

[8] Ciminelli contends that jurors will have difficulty compartmentalizing the Rule 404(b) evidence against Kaloyeros and the Syracuse Defendants, which will lead to spillover prejudice against himself and Laipple, including because the evidence may be so extensive and complex that jurors cannot be expected to keep track of what applies to each defendant. (Ciminelli MIL 12.) He relies on *United States v. Gallo*, 668 F. Supp. 736 (E.D.N.Y. 1987), a Racketeer Influenced Corrupt Organizations Act ("RICO") case in which the indictment charged 14 defendants in 22 separate counts and where the jury "must apply the highly technical and counter-intuitive RICO conspiracy elements to a great range of disparate predicate conspiracies and events" and where "[m]uch of the relevant evidence would have been introduced and stored in the jury's collective mind for many months—and a good deal of it introduced only as to certain defendants or certain

Furthermore, the Government intends to present each category of Rule 404(b) evidence in a focused and limited manner. *First*, with respect to the Albany RFP evidence, the Government expects to present a limited number of emails and elicit testimony from a former president of Fuller Road Management Corporation (who will testify about the charged conduct as well) and possibly another witness. *Second*, with respect to the Laipple attempt, the Government expects to present a small number of emails and elicit testimony from a former politician. *Third*, with respect to the Percoco bribery evidence, the Government expects to present a limited number of emails and elicit testimony from a law enforcement agent and a former State official (both of whom will testify about the charged conduct as well).

In addition, the jury will not consider any criminal charges related to Rule 404(b) evidence, which will significantly reduce the possibility that the jury will confuse the Rule 404(b) evidence with the charged wire fraud offenses. Indeed, the Government will not seek to establish that crimes were committed with respect to any of the Rule 404(b) evidence. The only charges in the June trial indictment will be ones related to the wire fraud scheme to defraud the Fort Schuyler Board. Accordingly, the limited presentation of the Rule 404(b) evidence, tempered with limiting instructions to protect the uninvolved defendants, will defuse the risk of unfair prejudice.[9]

Accordingly, Kaloyeros and Ciminelli's motions to preclude and sever, respectively, should be denied.

## II.     The Court Should Preclude Gerardi from Mentioning His Acquittals

The Court should preclude Gerardi from referring to, or introducing evidence of, his acquittals at the January trial. Gerardi argues that he should be permitted to refer to his acquittals

---

charges." *Id.* at 750. Those facts could not be more different from those in the instant case. The indictment charges the five defendants with one single wire fraud conspiracy and related substantive charges, along with two bribery counts. The Rule 404(b) evidence, meanwhile, will fall into three categories, each of which will apply clearly to only one or two defendants. And the trial will be significantly shorter than the length envisioned in *Gallo*.

[9] Two of the cases cited by Ciminelli do not speak to the question of severance of a multi-defendant trial due to the admission of Rule 404(b) evidence. In *United States v. Gilbert*, the district court severed the securities fraud trial of a defendant whose role was very minimal compared to the lead co-defendant because "the mounting proof of the guilt of one is likely to affect another." 504 F. Supp. 565, 566 (S.D.N.Y. 1980) (internal quotation marks omitted); *see also id.* ("[T]he gradual accumulation of evidence against the principal members of a conspiracy to violate the securities laws may require a separate trial for a minor participant, lately come to the venture."). That is not the case here, where the defendants all conspired to commit wire fraud by tailoring the RFPs and deceiving the Fort Schuyler Board. Meanwhile, in *United States v. Figueroa*, the Second Circuit first ruled that one defendant's prior conviction was improperly admitted, and then held that his two co-defendants were entitled to new trials because (1) jurors would likely connect the inadmissible conviction with the co-defendants' guilt, and (2) the case against all three defendants depended largely on the credibility of one law enforcement witness. 618 F.2d 934, 947 (2d Cir. 1980). *Figueroa* does not speak to when properly admitted Rule 404(b) evidence is so unfairly prejudicial as to require severance.

because they are "surely relevant evidence that goes to the bias of any witness who testified at the January Trial." (Dkt No. 628 ("Gerardi MIL") 2.) Gerardi seeks to bring his acquittals to the jury's attention because "the Government will make considerable efforts to fine-tune its witnesses' testimony" and the witnesses themselves "may attempt to rehabilitate their usefulness and credibility with the Government in order to protect their own interests." (Gerardi MIL 1-2.) These arguments are foreclosed by controlling law in this Circuit.

Gerardi cannot admit evidence of his acquittals because "a judgment of acquittal is not generally admissible to rebut inferences that may be drawn from other evidence, and the acquittal did not establish that [he] was not guilty." *United States v. Burrell*, 43 F. App'x 403, 406-07 (2d Cir. 2002) (citing *United States v. Viserto*, 596 F.2d 531, 537 (2d Cir. 1979) and *United States v. Marrero-Ortiz*, 160 F.3d 768, 775 (1st Cir. 1998)). "The Second Circuit has long held that absent claims of preclusion—whether based on collateral estoppel or double jeopardy—evidence of prior acquittals is not relevant at trial." *United States v. Ashburn*, No. 11 Cr. 303 (NGG), 2015 WL 729818, at *2 (E.D.N.Y. Feb. 19, 2015). Because the charges here relate to a separate scheme from the Percoco bribery scheme, Gerardi "does not, and could not, contend that double jeopardy or collateral estoppel preclude the Government" from offering evidence of his involvement in bribing Percoco under Rule 404(b). *Id.* Consequently, Gerardi's prior acquittal is not admissible. *See Viserto*, 596 F.2d at 537.

Furthermore, "a judgment of acquittal is hearsay" for which there is no exception in the Federal Rules of Evidence. *Viserto*, 596 F.2d at 537. Even assuming that Gerardi could overcome the hearsay problem, the admission of evidence of his acquittals would be unfairly prejudicial and confusing, and should be precluded under Rule 403. *See United States v. Gambino*, 818 F. Supp. 536, 539 (E.D.N.Y. 1993) ("[E]ven if such evidence [of an acquittal] had any evidentiary value, the danger it would present for confusion of the issues and misleading the jury substantially outweighs its probative worth.").

For the same reasons, Gerardi should also be barred from mentioning or referencing his acquittals during cross-examination. Because the fact of his acquittals is not relevant to this trial, any mention of it would be highly prejudicial and should be prohibited under Rule 403. The Second Circuit has explained that, "while an attorney may, of course, seek to impeach a witness by eliciting that he or she testified differently regarding a material matter at a prior trial, it is well within the discretion of the trial judge to disallow any testimony as to the outcome of the prior trial, where that information would be prejudicial." *United States v. Wilkerson*, 361 F.3d 717, 734 (2d Cir. 2004). In *United States v. Giovanelli*, 945 F.2d 479, 489 (2d Cir. 1991), a case that Gerardi cites extensively in his brief (*see* Gerardi MIL 2-3), certain Government witnesses had testified in multiple state trials that resulted in acquittals of the defendants. Of particular relevance here, the Second Circuit explained that the district court should have "permitted counsel to refer to the trials but not their outcome." *Id.*

The same result is appropriate here: Gerardi should be permitted to cross-examine witnesses about any purportedly inconsistent statements made during "a prior trial," but he should be precluded from mentioning the outcome of that trial or the fact that he was a defendant. *Id.*; *see also United States v. Raposo*, No. 98 Cr. 185 (DAB), 1998 WL 879723, at *7 (S.D.N.Y. Dec. 16, 1998) ("No reference shall be made to the outcome of the prior trial, nor to the fact that the

prior trial was of the Defendant."); *United States v. Cook*, 776 F. Supp. 755, 759-60 (S.D.N.Y. 1991) (same).

### III.    The Government Should Be Permitted to Introduce Evidence of Procurement Policies Followed by CNSE Employees

Kaloyeros argues that the Government should be barred from offering evidence of the "existence of, adherence to, or alleged violation of procurement policies." (Kaloyeros MIL 2.) He claims that evidence of procurement policies are not relevant to the issue of whether he committed the charged wire fraud crimes. He also asserts that evidence of those policies would be unfairly prejudicial and should be prohibited under Rule 403. He is incorrect on both counts.

The Government has alleged, and expects to prove at trial, that Kaloyeros knowingly made material misstatements and omissions to the Fort Schuyler Board regarding the fairness and competitiveness of the RFP processes for Buffalo and Syracuse. The Government expects that multiple witnesses who worked for Fort Schuyler, including the president and the director of procurement, will testify that they generally followed the SUNY Research Foundation's procurement policies when they administered the RFPs. In fact, evidence at trial will show that Kaloyeros himself had the same understanding. Moreover, the Government expects that Fort Schuyler Board members will testify that they also understood that the RFPs were administrated in general accordance with the Research Foundation guidelines. Those policies explain that their purpose is to "promote open and free competition in procurement transactions to the maximum extent practical" and to "to ensure that procurements are priced competitively and that the selection process is not influenced improperly." (Compl. ¶ 76.) Among other things, those policies required that "[s]uppliers that develop or draft specifications, requirements, statements of work, or requests for bids or proposals for a procurement must be excluded from competing in any resulting procurement." (Compl. ¶ 76.)

Kaloyeros contends that evidence of these policies is not relevant because their violation is not an element of wire fraud. But Rule 401 does not limit relevant evidence to that which directly proves an element of the crime. *See United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). To the contrary, evidence is relevant as long as "it has any tendency to make a fact more or less probable than it would be without the evidence," Fed. R. Evid. 401(a), and "evidence that adds context and dimension to the government's proof of the charges can have that tendency," *Gonzalez*, 110 F.3d at 941. The evidence will show that Fort Schuyler employees and Board members referenced and relied on the Research Foundation guidelines for procurement. Other evidence that Kaloyeros subverted or disregarded those policies—for instance, by providing draft RFPs to particular bidders and incorporating their edits into the final document—will tend to make it more probable that Kaloyeros intended to defraud the Board when he represented, among other things, that the RFP process was competitive, or when he failed to disclose his extensive dealings with the Buffalo Developer and COR Development prior to and during the RFP bidding period.[10]

_____

[10] Oddly, Kaloyeros relies on a civil case for the proposition that "violations of the law should not be inferred from purported breaches of internal or industry policies." (Kaloyeros MIL 3.) But his cited case concerned the scope of the duty of care that a broker owes to customers; the Second Circuit explained that the existence of more generous internal policies at the brokerage firm does not expand the broker's duty of care under the law. *See de Kwiatkowski v. Bear, Stearns*

Evidence about the Research Foundation policies will also tend to make it more probable that Kaloyeros's misstatements and omissions were purposeful rather than a mistake or accident. *See, e.g.*, *United States v. Santiago*, 528 F.2d 1130, 1134 (2d Cir. 1976) (evidence of defendant's "violation of State regulations" was admissible "in order to show guilty knowledge"); *United States v. Reamer*, 589 F.2d 769, 770 (4th Cir. 1978) (evidence of state law and Code of Professional Responsibility admissible to prove intent in trial against attorney for mail fraud). Furthermore, this evidence will rebut the defense's anticipated argument that Fort Schuyler was a non-profit corporation that was not subject to any particular procurement policies. (*See* Kaloyeros MIL 3.)

Kaloyeros counters that the admission of this evidence would be unfairly prejudicial under Rule 403, but his arguments are not persuasive.[11] He relies on an out-of-district order in an insider trading case that has no applicability to the facts here. *See United States v. Heron*, No. 06 Cr. 674, 2007 WL 2916196, at *1 (E.D. Pa. Oct. 5, 2007) (cited by Kaloyeros MIL 4). In *Heron*, the government alleged that the defendant, who worked for a particular company, traded on material, nonpublic information on three different occasions. *Id.* The government sought to introduce evidence that the company had imposed certain trading black-out periods that covered the defendant's three trades. *Id.* Those black-out periods were applied mechanistically to certain employees, "without any consideration as to whether the employees affected actually had material, non-public information during the period in question." *Id.* at *3. Because the defendant's breach of the black-out policy was not very probative as to the central question of whether the defendant "*actually* possessed material, non-public information," the court barred that evidence under Rule 403. *Id.* at *2. In contrast, in the instant case, one of the key issues at trial will be whether Kaloyeros intended to defraud the Board through his misrepresentations and omissions. The Board's understanding of how the RFP processes were administered was relevant to that question.

_____

& Co.*, 306 F.3d 1293, 1311 (2d Cir. 2002). The holding in *Kwiatkowski* appears to have no applicability whatsoever to this criminal case, where the question is whether Kaloyeros knowingly committed wire fraud. In any event, the Government certainly agrees that a violation of internal procurement policies is not equivalent to the commission of wire fraud. The Government will have to prove at trial (and it expects to) each element of wire fraud and conspiracy beyond a reasonable doubt. But, as explained above, evidence of the Research Foundation policies is relevant to Kaloyeros's intent, knowledge, and lack of mistake or accident, and the jury will be free to draw inferences from the evidence.

[11] Kaloyeros warns that admission of evidence related to Research Foundation policies will lead to a trial within a trial. In support of that claim, he asserts that he will have to ask Fort Schuyler Board members and employees some questions on cross-examination about "whether Fort Schuyler actually adhered to the Research Foundation's policies in practice, whether those policies were appropriate, how those policies were interpreted, and other irrelevant matters." (Kaloyeros MIL 5 n.4.) As an initial matter, it is difficult to understand how asking those types of questions would be so time consuming or distracting as to become a significant distraction. The Government also anticipates that it would object to any questions about the "appropriateness" of the policies, which is not relevant to the issue of whether Kaloyeros knew about the policies, subverted them, and then lied to the Board about his actions. Meanwhile, the Government may ask on direct examination Kaloyeros's suggested questions about how Fort Schuyler referred to and interpreted the policies in practice. Accordingly, admission of the disputed evidence will not lead to a trial within a trial.

In addition, Fort Schuyler employees' use of the Research Foundation policies is also relevant to inferring the intent and knowledge of Kaloyeros's statements and omissions. Unlike in *Heron*, the probative value of the contested evidence is high.

The Government will also take steps to ensure that the evidence is not unfairly prejudicial. As explained above, the Government will argue that Kaloyeros's subversion of the commonly accepted Research Foundation policies is proof of his intent, knowledge, and lack of mistake or accident with respect to what he did and did not tell the Fort Schuyler Board. The Government, however, will not contend that finding "a violation of [the policies] is equivalent to a finding that Dr. Kaloyeros is guilty of a crime." (Kaloyeros MIL 4.) Moreover, the Government is open to discussing with his counsel a proposed jury instruction that would also make that point clear.

In view of the foregoing, Kaloyeros's motion to preclude evidence related to the SUNY Research Foundation policies should be denied.

## IV.  The Government Should Be Permitted to Ask Fact Witnesses About Their Understandings of Email Messages and Documents that They Received

Kaloyeros seeks a ruling to preclude the Government from eliciting "lay opinion testimony" of a witness's own understanding of the meaning a conversation or message to which the witness was a party. But such testimony is appropriate under Federal Rule of Evidence 701 as long as the witness has a proper basis of knowledge and is interpreting "statements or words . . . that would be ambiguous or unclear to someone who was not a participant in the conversation." *United States v. Urlacher*, 979 F.2d 935, 939 (2d Cir. 1992). Thus, Kaloyeros's motion cannot be decided in the abstract and should be denied, at a minimum, as premature.

Rule 701 provides that a lay witness may testify to "those opinions which are: (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed. R. Evid. 701. The Second Circuit has explained that "the first prong requires that a witness meet 'the familiar requirement of first-hand knowledge or observation,'" *id.* (quoting Fed. R. Evid. 701, advisory comm. note), and the "second prong requires that the testimony be helpful to the jury's clear understanding of the witness's testimony," *id.*

Kaloyeros concedes that the Government may properly ask a witness about his understanding of the meaning of what someone else said to him "provided that the proponent of the testimony first establishes a proper foundation," and the testimony is helpful to the jury. *United States v. Garcia*, 291 F.3d 127, 141 (2d Cir. 2002); *see* (Kaloyeros MIL 6-7). As to the first prong of personal knowledge, the witness's participation in the conversation, along with his familiarity with the author of the message, would more than satisfy the foundation requirement for eliciting the witness's lay opinion testimony. *See, e.g.*, *United States v. Skelly*, 442 F.3d 94, 100 (2d Cir. 2006) (finding no error in admission of "two witnesses' testimony as to their understanding of the meaning of various statements [the defendant] made in the course of conversations with them" because "both witnesses had first-hand knowledge of the conversations and their testimony may have aided the jury's understanding of those conversations"). The Government will have the opportunity to ask these foundational questions when its witnesses take the stand at trial. As a result, the Court cannot assess before trial whether the Government will be able to lay the proper

foundation for any given witness. During trial, if Kaloyeros believes that the foundation is not sufficient to justify a particular question about the meaning of an email or document, he will be free to object.

Kaloyeros's motion is also premature because the Court cannot decide now whether the Government will ask questions that elicit testimony that is helpful to the jury. Testimony of a co-conspirator that explains "ambiguous references to events that are clear only to the conversant . . . has been repeatedly endorsed by the Second Circuit." *United States v. Lumiere*, 249 F. Supp. 3d 748, 755 (S.D.N.Y. 2017); *see, e.g.*, *Urlacher*, 979 F.2d at 939 (finding no error in the admission of co-conspirator testimony explaining "statements or words on the tape that would be ambiguous or unclear to someone who was not a participant in the conversation"). For example, the Second Circuit found that it was not error for the district court to allow a witness with first-hand knowledge of conversations with the defendant "to testify about the meaning of [the defendant's] use of expressions like 'I get it,' 'this arrangement,' and 'cover,' because those expressions were ambiguous without the context that [the witness] supplied." *United States v. Rowland*, 826 F.3d 100, 115 (2d Cir. 2016).

The dubiousness of Kaloyeros's motion is clear from the examples from the January trial that he cites as supposedly impermissible lay opinion. For example, he argues that the Government should not have been permitted to ask Howe about what Percoco meant by what he (Percoco) wrote in certain emails, including Percoco's question "Shall I send you new invoices?" in an email that discussed bribes from both COR Development and CPV.[12] (Kaloyeros MIL 5 n.5.) This argument is without merit. As to the first prong, the Government established more than sufficient foundation for its questions. Howe personally participated in the communications, and he also established the factual basis for his understanding of what Percoco said to him. Howe testified that he had known Percoco for more than 30 years, that Percoco was like a brother to him, and that he communicated with Percoco frequently. (*See, e.g.*, Jan. Trial Tr. 2092, 2116, 2130.) What is more, Howe had also testified that Percoco had told Howe about his serious financial desperation, and that they had schemed together to find payments, which they referred to as "ziti," for Lisa Percoco and Joseph Percoco himself. (*See, e.g., id.* at 2132-33, 2298, 2299-2301, 2384-86.) Meanwhile, Howe had close working relationships with the other defendants, who were his long-term clients. Thus, Howe "had first-hand knowledge of the conspiracy being discussed" that was "sufficient to interpret the statements of his former partner-in-crime."[13] *United States v. Lumiere*,

---

[12] Kaloyeros misinterprets the Government's question "In general terms, what is Joe Percoco asking you for in those emails?" (Kaloyeros MIL 5 n.5), which did not ask Howe to interpret any specific language written by Percoco but instead asked Howe to summarize the substance of several emails that were being introduced in bulk (Jan. Trial Tr. 2486).

[13] In stark contrast, the cooperating witness in *Garcia* had only met the defendant a few months prior when the two worked together on asbestos removal projects. *Garcia*, 291 F.3d at 132. Through an intermediary, the cooperating witness learned that the defendant could sell him cocaine. *Id.* The cooperating witness later testified that a single recorded conversation, during which he and the defendant appeared to discuss an asbestos project, was actually coded drug talk. *Id.* at 134. But the cooperating witness never explained why the defendant would have understood that he (the cooperating witness) was speaking in code. "For example, [the cooperating witness] did not testify that they had spoken in code before; he did not testify that the code he used was a

249 F. Supp. 3d 748, 755 (S.D.N.Y. 2017); *see also United States v. Yannotti*, 541 F.3d 112, 125 (2d Cir. 2008) (A witness's "testimony was rationally based on his own perception because it derived from his direct participation in the loansharking activities of the charged enterprise . . . .").

As to the second prong, Howe's testimony was certainly helpful to the jury. *See Skelly*, 442 F.3d at 100. Howe was an active participant in the two Percoco-related bribery conspiracies, which spanned more than three years. He frequently bridged the communications between Percoco and Braith Kelly, as well as Percoco and the Syracuse Defendants, and he both used and heard the "kind of shorthand and oblique references that only a person familiar with the background would readily grasp." *Lumiere*, 249 F. Supp. 3d at 755. Based on this personal knowledge, Howe was able to tell the jury about the meaning of expressions of his co-conspirators that "were ambiguous without the context that [Howe] supplied." *Rowland*, 826 F.3d at 115. The "new invoices" email (Government Exhibit 117) that Kaloyeros cites in fact illustrates how Howe's testimony was helpful to the jury. That email chain referenced both bribery schemes. Percoco began by asking about the "new invoices," an ambiguous phrase that Howe explained referred to payments to Percoco during his time on the Governor's reelection campaign. (Jan. Trial Tr. 2384.) The conversation in the email chain then turned to the CPV payments to Lisa Percoco, and to Percoco's efforts to placate Kelly. (*Id.* at 2385-86.) Eventually, Percoco demanded: "Now do your part. Sending new invoices shortly." The meaning of Percoco's message is not obvious on its face, and Howe was able to explain that Percoco was asking to be paid by COR. (*Id.* at 2387.) Accordingly, the Government's questions of Howe during the January trial were proper and admissible pursuant to Rule 701.

Kaloyeros next argues that the Government should be barred from asking witnesses to interpret messages that are not coded. (Kaloyeros MIL 7-8.) In making this argument, he overstates the law and misreads the cases cited in his brief. As *Garcia* expressly acknowledges, the Government is entitled to ask a witness who has personal knowledge of a communication to interpret the other speaker's meaning so long as the Government lays a proper foundation, even if that speaker's message is not coded. *See* 291 F.3d at 141 ("'[T]here is no theoretical prohibition against allowing lay witnesses to give their opinions as to the mental states of others,' provided that the proponent of the testimony first establishes a proper foundation." (quoting *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992))); *Lumiere*, 249 F. Supp. 3d at 756 n.1. To counter that clear legal principle, Kaloyeros relies on *United States v. Grinage*, 390 F.3d 746 (2d Cir. 2004), where the Second Circuit vacated a drug conviction because a law enforcement agent testified as a lay witness about the meaning of certain recorded conversations between other individuals. *Grinage* is inapposite because, unlike a fact witness, the agent in that case did not participate in the recorded conversations and therefore was not testifying based on his own personal perceptions, as required by Rule 701(a). *Cf. United States v. Garcia*, 413 F.3d 201, 211-12 (2d Cir. 2005) (an undercover agent who engaged in a drug transaction could testify to his perceptions about the other participants' roles because "Rule 701 affords the jury an insight into an event that was uniquely available to an eyewitness").

---

common one; and he did not testify that Garcia and he had a prior agreement to speak in code or that they had discussed this possibility." *Id.* at 141. The government in *Garcia* did not lay a sufficient foundation for the cooperating witness's testimony.

In sum, Kaloyeros's motion to preclude "lay opinion testimony" should be denied as premature. Furthermore, the Government should be permitted to ask fact witnesses with the requisite personal knowledge about their understandings of the meanings of emails and documents that they received.

### V. The Government Should Be Permitted to Elicit Evidence of the Materiality of Kaloyeros's Misrepresentations and Omissions

Kaloyeros seeks to bar the Government from asking its witnesses what they would have done had they known about the actions and information that Kaloyeros concealed from the Fort Schuyler Board. (Kaloyeros MIL 9.) Put another way, Kaloyeros wants to prevent the Government from establishing the materiality of his misstatements and omissions. His efforts should be rejected.

To prove Kaloyeros (and the other defendants) guilty of wire fraud or conspiracy to commit wire fraud, the Government is required to prove that the defendants made misstatements or omissions that were material. *See Neder v. United States*, 527 U.S. 1, 25 (1999) ("[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes."). The Government anticipates eliciting testimony from members of the Fort Schuyler Board that, among other things, (a) they understood that the RFP processes were open and competitive; (b) Kaloyeros did not disclose to them that he had relationships with the Buffalo Developer and COR Development stretching back well before the issuance of the Buffalo and Syracuse RFPs; (c) he did not disclose to them that the Buffalo Developer and COR Development were provided the draft RFPs prior to their public issuance; and (d) if the Board members had known this information, it would have changed their behavior. This evidence will be highly probative of the materiality element and therefore is admissible.[14]

Separately, the Government may also ask "hypothetical" questions to show that the defendants, through their actions, contemplated economic harm to Fort Schuyler, which is another element of right-to-control wire fraud. For instance, the Government has alleged that Kaloyeros contemplated or intended economic harm to Fort Schuyler through his efforts to tailor the RFP, obfuscate the size and scope of the projects tied to the RFP, and use procedural hurdles to prevent other developers from submitting bids. The Government anticipates that a witness who works for a different developer in Buffalo will testify that, if he had known the winner of the RFP would be awarded the $200 million Riverbend project, he would have submitted a bid. The loss of that bid is proof of the intended economic harm of Kaloyeros's actions because it deprived Fort Schuyler of the benefits of additional competition, which might have included bidders with either higher quality or lower costs.

---

[14] During the recent trial of *United States v. Silver*, the Court overruled a defense objection to the Government's materiality question, which was posed to Assemblymember Amy Paulin. *See* 15 Cr. 93 (VEC), Trial Tr. 100-01 (S.D.N.Y. Apr. 30, 2018) (Q: "If you had learned that Sheldon Silver was receiving hundreds of thousands of dollars from Glenwood and Witkoff's business, would it have mattered to you as a member of the assembly?" MR. FELDBERG: "Objection." THE COURT: "Overruled." A: "Yes.").

Kaloyeros raises a number of arguments, all of which lack merit. *First*, he contends that this evidence is prohibited by Rules 602 and 701 because "hypothetical questions, by their definition, are not based on personal knowledge." (Kaloyeros MIL 11.) Under Kaloyeros's circular reasoning, because Kaloyeros either affirmative misrepresented or did not disclose certain facts to the directors of the Fort Schuyler Board, the directors had no knowledge of those facts, and therefore cannot testify about whether Kaloyeros disclosed those facts to them. This argument is nonsensical. The Board members' lack of knowledge is precisely the point (and the same is true for the other developers' lack of knowledge). The fact that Kaloyeros did not disclose to the Board his contact and communications with certain developers is evidence that he made material misrepresentations and omissions. Similarly, evidence that the misrepresented or omitted facts would have mattered to the directors is important evidence of materiality. The Board members (and the other developers) are fully competent to testify about these matters even without personal knowledge of the defendants' unlawful scheme. The Board members have firsthand knowledge of how business was done at Fort Schuyler and have firsthand knowledge of what sort of facts and issues mattered to them as directors. (Similarly, the other developers in Buffalo are familiar with RFPs and have firsthand knowledge of what kind of information mattered to them in assessing whether and how to bid on an RFP.) Thus, their testimony would satisfy the personal knowledge requirement of Rule 602.

*Second*, Kaloyeros contends that hypothetical questions will assume his guilt. (Kaloyeros MIL 10.) In support of this proposition, however, he cites a case that pertains to a completely different and unrelated subject: the cross-examination of character witnesses. (*See id.* (citing *United States v. Oshatz*, 912 F.2d 534, 539 (2d Cir. 1990) (holding that "guilt-assuming hypothetical questions asked of lay character witnesses like friends or neighbors" are impermissible)).) Kaloyeros does not make any effort to explain why the reasoning underlying *Oshatz* applies here, where the anticipated witnesses will not be character witnesses but instead fact witnesses whose testimony will establish that they did not know certain material facts. In cases involving the alleged nondisclosure of material facts, there is simply no way to elicit testimony about whether the undisclosed facts were material except by asking an appropriate witness (i) whether the witness was aware of the facts, and (ii) if not, whether and how the facts would have mattered to the witness's decisions. Hypothetical questions of that nature are not "guilt-assuming," they are simply the only way to prove materiality, which is an essential element of the crime. *See United States v. Morgan*, 554 F.2d 31, 33 (2d Cir. 1977) ("Indeed, in technical cases such as those involving tax fraud, it is difficult to visualize how the Government could prove its case in any other manner" than asking hypothetical questions "which assume the very facts upon which the defendant's guilt is predicated."). The law on the cross-examination of character witnesses is irrelevant.

*Third*, Kaloyeros incorrectly contends that testimony stemming from hypothetical questions will usurp the jury's role by telling jurors what result to reach. (Kaloyeros MIL 12.) The Government will not ask its witnesses to testify to any legal conclusion or assert that the defendant had committed any crime. Instead, the Government will ask whether certain information, if true and known, would have changed the witness's behavior. The jury will be free to draw its own inferences from such testimony.

*Fourth*, Kaloyeros warns that witnesses will give self-serving answers to hypothetical questions related to materiality. He posits that witnesses connected to the State government will be motivated to respond that "even the smallest piece of information would have made an enormous difference to their decisions" in an effort to "avoid scrutiny from the press at all costs." (Kaloyeros MIL 10.) This assertion, of course, is pure speculation and is not a ground for prohibiting the Government from eliciting evidence of materiality. Unlike the plaintiffs in the civil cases that Kaloyeros relies on, whose motive to give self-serving testimony is obvious, there is no reason to believe that media attention will influence sworn fact witnesses such as the Fort Schuyler Board members to testify untruthfully. (*See* Kaloyeros MIL 10 (citing the court's skepticism of speculative testimony by particular plaintiffs in the civil lawsuit *Cain v. Trans World Airlines, Inc.*, 549 F. Supp. 963, 968 (S.D.N.Y. 1982); *see also id.* at 11 n.14 (citing more civil cases about plaintiffs' testimony).) If Kaloyeros has a reason to believe that a certain witness is biased against him, he will have the opportunity to cross examine that witness.

In sum, in this case, as in any case where the defendant is charged with making material omissions, the Government has the right, and the obligation, to introduce testimony from one or more victims establishing that the victim was unaware of the misrepresented or omitted facts and that those facts would have mattered to the victim's decisionmaking. The members of the Fort Schuyler Board, who are fact witnesses, will have more than sufficient personal knowledge to testify about what would have mattered to them as directors, and the probative value of their testimony will far outweigh any alleged prejudicial effect. For all these reasons, Kaloyeros's arguments should be rejected.

## VI. The Government Should Be Allowed to Offer Evidence of Kaloyeros's Motive, Including His Desire to Retain His Lucrative State Position

Kaloyeros moves *in limine* to preclude the Government from offering evidence of his compensation as the head of CNSE and his desire to ingratiate himself with the Governor's Office in order to maintain his position. In other words, Kaloyeros seeks to prevent the Government from establishing Kaloyeros's motive to commit the charged offenses. His motion should be denied.

The Government expects to prove at trial that, when Governor Cuomo first took office in or about 2011, Kaloyeros had been the head of CNSE for many years and had worked on nano-related economic development projects in the Albany area. The new administration initially regarded Kaloyeros with skepticism, and Kaloyeros understood that he was at risk of being fired and losing his highly paid position. In an effort to improve his relations with the new administration, Kaloyeros sought out Howe, who had extensive connections to senior State officials, and retained him through the law firm through which Howe was affiliated. Kaloyeros also tried to ingratiate himself with the administration by rigging the Buffalo and Syracuse RFPs to benefit two major Upstate contributors to the Governor, namely, the Buffalo Developer and COR Development. Indeed, Howe counseled Kaloyeros that those developers were "friends," meaning that they had contributed large amounts to the Governor's campaign.

The Government is entitled to offer evidence that the threat to Kaloyeros's job security motivated him to defraud the Fort Schuyler Board and steer the RFP awards in an effort to please the administration. The fact that Kaloyeros's position as the head of CNSE paid him more than

half a million dollars a year is part and parcel of his motivation. *Cf. United States v. Logan*, 250 F.3d 350, 369 (6th Cir. 2001), *abrogated on other grounds by* F.R.E. 408 (2006) ("Stated another way, Appellants' substantial income was necessarily dependent upon [a government mortgage association's] continuation of [the Appellant's firm's] loan commitment authority. . . . the income evidence had a significant probative value because it demonstrated what Appellants stood to lose if they properly reported the actual loan delinquencies.") (cited by *United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006)). In *Quattrone*, the Second Circuit held that the district court did not abuse its discretion in permitting the Government to offer evidence of the defendant's "substantial salary" to establish a motive for the defendant to "protect his reputation and that of" his firm by obstructing certain investigations (the offense for which he was charged). In this case, the link between Kaloyeros's salary and his commission of the charged wire fraud is more direct than in *Quattrone*—Kaloyeros was motivated to rig the bids not to protect his reputation, but because he wanted to maintain his job and compensation.

In opposition, Kaloyeros again cites a number of civil cases in which the Second Circuit rejected as insufficient the plaintiff's allegations that "the defendants concealed and misrepresented the corporation's financial condition to inflate the price of the common stock and to maintain artificially high prices in order to protect their executive positions and compensation." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (securities-fraud civil suit) (cited by Kaloyeros MIL 13). These holdings, which govern the stricter pleading requirements in securities-fraud civil actions, have no relevance to the admissibility of evidence in criminal cases. *Cf. United States v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422, 479 (E.D.N.Y. 2007) ("[T]he bare allegations in those criminal indictments are not sufficiently specific to satisfy the heightened pleading requirement that applies to allegations of mail or wire fraud under Federal Rule of Civil Procedure 9(b)."). In criminal cases, the relevant standard is found in *Quattrone*.

As in *Quattrone*, the Government will only use the evidence of Kaloyeros's salary "for the limited purpose of establishing a motive to [commit wire fraud]" and will make clear that this evidence "could not be used to convict [Kaloyeros] simply because of his wealth." *Quattrone*, 441 F.3d at 187; *see also United States v. Peters*, 543 F. App'x 5, 10 (2d Cir. 2013) (affirming the Government's introduction of evidence of the defendant's wealth because "some evidence of the defendant's wealth was relevant to the question of motive"). The Government certainly has no intention to "[a]ppeal[] to the jury's bias against the wealthy." (Kaloyeros MIL 14.) "While evidence of compensation, wealth, or lack thereof can unduly prejudice jury deliberations, that evidence may be admitted when other safeguards are employed such as limiting instructions or restrictions confining the government's references to that wealth." *Quattrone*, 441 F.3d at 187. The Government is open to discussing with the defense an appropriate limiting instruction to eliminate any risk of unfair prejudice.

## VII. Ciminelli's Motions Should Be Denied

Ciminelli makes several motions *in limine*, none of which has merit.

*First*, Ciminelli seeks a ruling prohibiting the Government from arguing in its opening statement that bid rigging alone is sufficient to establish wire fraud. (Ciminelli MIL 2-5.) This motion should be denied. As an initial matter, it is axiomatic that the Government's opening statement and other jury addresses are not evidence. Moreover, "[i]t is of course a commonplace

that the jury is bound to follow the trial court's instructions concerning the law," *United States v. Schwartz*, 548 F.2d 427, 430 (2d Cir. 1977), and not the statements of either the Government or defense counsel. Because juries are presumed to follow their instructions, *see United States v. Pforzheimer*, 826 F.2d 200, 205 (2d Cir. 1987), Ciminelli's concerns are unnecessary. In any event, the Government, like the Court and the defendants, is familiar with the law related to the right to control theory of wire fraud. That is why the Government alleged in the S2 Indictment that the defendants "devised a scheme to defraud Fort Schuyler of its right to control its assets, and thereby exposed Fort Schuyler to risk of economic harm, by" making false representations to Fort Schuyler about the RFP process. (S2 Indictment ¶ 39; *accord id.* ¶¶ 41, 45.) The Government will be scrupulous in its preparation of its opening statement. When the Government delivers its opening statement, Ciminelli will be free to object as he sees fit.

*Second*, Ciminelli moves to preclude the Government from arguing that the "preferred developer" status awarded to the respective winners of the Buffalo and Syracuse RFPs "is 'property' within the meaning of the wire fraud statute." (Ciminelli MIL 5-8.) Here, Ciminelli is trying to relitigate an issue that he already lost. Ciminelli raised this challenge in detail in his pretrial motions. (Dkt. No. 220, at 28-41.) Furthermore, in connection with the federal grand jury's return of the S2 Indictment in or about September 2017, Ciminelli filed a letter arguing that changes from the previous indictment amounted to a concession that the preferred developer RFPs were separate from the contracts for work awarded to the Buffalo and Syracuse Developers, and thus, any deceit or misrepresentation with respect to the preferred developer RFPs could not have defrauded Fort Schuyler of its right to control the assets awarded to the Buffalo and Syracuse Developers. (Dkt. No. 332, at 4.) The Government in its own letter explained why Ciminelli was wrong:

> As the defendants were well aware, the bidding processes leading to certain large, publicly-funded projects were designed so that Fort Schuyler would cede to Kaloyeros the authority to award those projects to any company that had been determined to be a "preferred developer." Kaloyeros and his co-conspirators gained control over Fort Schuyler's assets by tailoring the RFPs so that the Buffalo and Syracuse Developers were selected as preferred developers, to whom Kaloyeros then was authorized to award valuable contracts without further oversight from Fort Schuyler's board of directors.

(Dkt. No. 336, at 4.)

On December 11, 2017, the Court denied, among other things, the defendants' motion to dismiss the RFP-related wire fraud charges. The Court observed that "property interests" that fall within the scope of the wire fraud statute include "intangible interests, such as the victim's right to control its own assets." *United States v. Percoco*, 16 Cr. 776 (VEC), Order at 13 (S.D.N.Y. Dec. 11, 2017) (Dkt. No. 390). Under the right to control theory, "the victim must be deprived of material, potentially valuable economic information that would have affected a decision relating to its assets." *Id.* (citing *United States v. Finazzo*, 850 F.3d 94, 107-12 (2d Cir. 2017)). The Court found that a "reasonable juror could determine that the Defendants' misrepresentations deprived Fort Schuyler of material, economically-valuable information when it made its decision to grant the Buffalo Defendants' company preferred developer status, as Fort Schuyler then proceeded to

negotiate the ultimate development contract with the Buffalo Defendants' company, mistakenly believing that it had been selected as a preferred developer because it was the best-suited for Fort Schuyler's development projects." *Id.* at 15.

It is clear from the S2 Indictment and the Court's order that the property interest at issue was Fort Schuyler's right to control its own assets. That right was taken away from the corporation by the defendants, who made misrepresentations and omissions that deprived Fort Schuyler of material information that would have affected its decision-making. Notwithstanding all this prior litigation, Ciminelli seeks to reopen the issue. That effort should be denied. Ciminelli offers a new citation to an out-of-district opinion in support of his position, but the facts there are distinguishable. (Ciminelli MIL 7-8.) In *United States v. Slay*, the city council ran a competitive process to pick qualified persons to be awarded cable television franchises. 717 F. Supp. 689, 691 (E.D. Mo. 1989). The winners, however, would not be able to operate their franchises until the city council passed further legislation. *Id.* The defendants, who were eventually charged with mail and wire fraud, submitted a bid in which they falsely concealed the ownership interest of one defendant in their company from the city council. *Id.* Of relevance here, the district court dismissed the indictment on the ground that the defendants did not intend to deprive the city of its property rights because winning the bid would not have entitled them to operate the franchise absent further legislative action. *Id.* at 694-95.

*Slay* is not analogous to the instant case. The RFP process did not lead to an arms'-length contract negotiation between the developers and disinterested Fort Schuyler Board members or employees. The developer defendants knew that winning the RFP would lead to huge State-funded contracts. The tailored RFP process prevented Fort Schuyler from fairly considering other bids, whether or not those bids may have been more suitable and beneficial to Fort Schuyler, and resulted in the coconspirators sitting at the table together for contract discussions. In contrast, the defendants in *Slay* sought to hide information from the city council, which selected the winning bids. Furthermore, there is an important difference in what the defendants in *Slay* would have won compared to what the Buffalo Developer and COR Development did win. A successful bidder in *Slay* was going to receive one thing: a cable television franchise. In this case, however, the chosen "preferred developer" won the right to receive a limitless number of projects from Fort Schuyler without any further procurement process. Indeed, COR Development, as the preferred developer, was initially awarded the film hub project (without a separate procurement), and sometime later was given the LED manufacturing plant (also without another procurement). The Fort Schuyler Board relinquished valuable rights with respect to future projects that the *Slay* city council did not when the Board ratified the RFP processes without awareness of the behind-the-scenes bid rigging.

*Third*, Ciminelli seeks a jury instruction that New York law permits a prospective bidder to help with drafting a RFP. This motion is flawed for several reasons. As an initial matter, Ciminelli's authority for this purported legal principle consists of a 1980 legal opinion of the New York State Comptroller, in which the Comptroller's view was not that pre-bid drafting is expressly authorized but only that there "is no rule of law which would preclude" those activities, and a 1972 state court case, where, unlike in the instant case, the company that helped provide the specifications for the RFP (the "local Caterpillar dealer") apparently was not the same company that won the bid ("Jordon-Milton Machinery, Inc. of Concord, New Hampshire"). (Ciminelli MIL

9 (citing Comptroller Op. 80-503 (1980) and *Bailey v. Corona*, 73 Misc.2d 299, 301 (N.Y. Sup. Ct. 1972)).)  Neither of these sources supports the proposition that Ciminelli advances.

Next, in sharp contrast to the cases cited by Ciminelli (*see* Ciminelli MIL 9), none of the elements of the charged wire fraud offenses depends on the interpretation or application of state law.  *Cf. United States v. Fazal-Ur-Raheman-Fazal*, 355 F.3d 40, 47 (1st Cir. 2004) (international parental kidnapping case where the issue of whether the victim-parent had "parental rights" may be defined by state law); *United States v. Wilkerson*, 702 F. App'x 843, 849 (11th Cir. 2017) (case involving a statute for which the government must show the defendant used facilities of interstate commerce to induce a minor to commit a criminal sexual activity, including one prohibited by state law); *United States v. Gabinskaya*, 829 F.3d 127, 131 (2d Cir. 2016) (charges that the defendant submitted fraudulent claims under New York no-fault insurance law depended on whether the defendant was the true owner, as defined by state law, of certain medical services corporations).  As explained in Section III, *supra*, evidence related to the SUNY Research Foundation procurement policies is simply proof tending to establish the defendants' intent, knowledge, and lack of accident or mistake.[15]  Accordingly, Ciminelli is not entitled to any instruction about state law.[16]  In any event, Ciminelli's motion should be denied under Rule 403. His proposed instruction on New York law would only confuse and mislead the jury as to the elements of wire fraud that the Government must prove beyond a reasonable doubt.

## VIII. The Court Should Admit Evidence Regarding Campaign Donations and Deny Aiello's Motion to Preclude

Aiello moves to preclude the Government from offering evidence of campaign contributions made by himself, other COR Development executives, and limited liability corporations ("LLCs") affiliated with COR Development.  (Dkt. No. 634 ("Aiello MIL") 1-3.) Aiello's motion is based on a fundamental misreading of the S2 Indictment and should be denied. The Government does agree with Aiello that a limiting instruction similar to the one provided by the Court in the January trial would be appropriate in this trial when the Government offers campaign contribution evidence.  (*See* Jan. Trial Tr. 2209, 2441.)

Aiello points to paragraph 23 of the S2 Indictment to support his claim that the Government "appears poised to argue that these legal campaign contributions are an illegal *quid*."  (Aiello MIL 2.)  That reading of the indictment is not correct.  Paragraph 23 states, in relevant part, that "the Syracuse Developer and the Buffalo Developer had been preselected by Howe and KALOYEROS to become the preferred developers, after the Syracuse Developer and the Buffalo Developer had each made sizeable contributions to the Governor's reelection campaign and *had begun paying*

---

[15] To the extent that Ciminelli is asserting that he did not have criminal intent because, when he helped draft the RFP prior to its release, he believed his actions to be lawful, he is entitled to testify about his state of mind at trial.

[16] In some cases, courts have barred defendants accused of bribery from introducing evidence of compliance with particular state laws or regulations.  Those courts have reasoned that such evidence "could easily have misled the jury into thinking" the defendant's compliance with certain cherry-picked laws "could excuse bribery," when in fact the state had expressly criminalized bribery.  *United States v. Urciuoli*, 613 F.3d 11, 15-16 (1st Cir. 2010).

*Howe in exchange for Howe's influence* over the RFP processes." (S2 Indictment ¶ 23 (emphasis added).) The "in exchange for" language only modifies "had begun paying Howe" and does not apply to the campaign contributions. Indeed, the Government made clear throughout the January trial and again in its motions *in limine* for this trial that "the Government will not argue that the defendants donated to the Governor's campaigns in exchange for an explicit promise to perform an official action." (Gov't MIL 8.) The Government previously explained the reasons for admitting evidence of the Syracuse Defendants' and Ciminelli's contributions. (*Id.* at 6-9.)

Aiello contends, in the alternative, that the Court should only permit evidence of contributions by Aiello and Gerardi, and not those of their immediate family members, their business partners, and their company's affiliated LLCs. Aiello argues that these other people's contributions are not relevant because they were not charged with wrongdoing, and because the higher combined contribution total is unfairly prejudicial. But it is irrelevant that these other COR-related contributors are not charged with a crime because, as explained above and elsewhere, the Government has not alleged that any of the contributions, including those of Aiello and Gerardi, were wrongful. Instead, all the COR-related contributions are relevant because that aggregate total established COR Development as a major contributor. That status explains Kaloyeros and Howe's motivations in conspiring with COR Development to secretly rig the RFP process. (*See* Gov't MIL 8-9.) What is more, the significant combined contributions are evidence of the importance COR Development placed on currying favor with the Governor's Office, and the importance of State contracts and money to the business. Any risk of unfair prejudice from admission of the total COR-related contributions will be mitigated with the proposed limiting instruction.

Finally, Aiello also preemptively objects to the admission of an email and attachment marked as Government Exhibit 504.  (Aiello MIL 3.)  The exhibit was discussed extensively at sidebar and the Court ultimately overruled Aiello's objection and received it into evidence.  (*See* Jan. Trial Tr. 2434-39.)  The fact that some media reports republished the attached photograph of sports cars does not demonstrate that the exhibit was unfairly prejudicial at trial.  The Court gave a limiting instruction regarding the legitimacy of campaign contributions before receiving the exhibit.  (*Id.* at 2340.)  The protection of a similar limiting instruction will suffice to mitigate the risk of unfair prejudice if the Government offers this exhibit again at trial.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York


By: _/s/_____
    Robert Boone
    David Zhou
    Matthew Podolsky
    Assistant United States Attorneys
    (212) 637-2208/2438/1947

cc:  Counsel for all defendants (via ECF)