

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 19, 2018

**BY ECF**

The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. Alain Kaloyeros*, S2 16 Cr. 776 (VEC)

Dear Judge Caproni:

      The defendant in the above-captioned case, Alain Kaloyeros, is scheduled to be sentenced on December 11, 2018, having been convicted, following a jury trial, of one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and two counts of wire fraud, in violation of 18 U.S.C. § 1343, arising from his participation in a fraudulent scheme to direct hundreds of millions of New York State taxpayer dollars to his co-conspirators' companies. Under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), the sentencing range applicable to the defendant's conduct is 135 to 168 months' imprisonment. For the reasons set forth below, in order to satisfy the goals of sentencing, and consistent with the recommendation of the United States Probation Office, the Government respectfully submits that the defendant should be sentenced principally to a substantial term of imprisonment, though, in light of the sentencing factors set forth in 18 U.S.C. § 3553(a), a sentence below the applicable Guidelines range is warranted in this case.

**I.     BACKGROUND**

     **A.**    **Offense Conduct**

      From approximately 2013 through 2015, Kaloyeros engaged in a scheme to rig and corrupt the process leading to New York State-funded construction contracts worth more than $850 million. Kaloyeros, the head of a college of the State University of New York, used his position and influence to tailor the bidding process for those contracts to favor the clients of his lobbyist, Todd Howe—namely, the Syracuse-based real estate development company owned in part by Steven Aiello and Joseph Gerardi (COR Development) and the Buffalo-based construction company owned by Louis Ciminelli (LPCiminelli). (Presentence Investigation Report ("PSR") ¶¶ 38-42, 45-49.) Kaloyeros, Howe, Aiello, Gerardi, and Ciminelli worked together to deceive

Honorable Valerie E. Caproni
November 19, 2018
Page 2 of 7

Fort Schuyler Management Corporation ("Fort Schuyler," a not-for-profit affiliated with the State University of New York) by, among other things, secretly tailoring the required qualifications for those development deals so that COR Development and LPCiminelli would be awarded contracts in Syracuse and Buffalo, respectively, without meaningful competition, while falsely representing to Fort Schuyler that the bidding process was legitimate and competitive. (PSR ¶ 50.)

The opportunity for this fraud arose from New York Governor Andrew Cuomo's initiative—referred to broadly as the "Buffalo Billion"—to invest a billion dollars in the Upstate New York region in an effort to revive the Upstate economies and bring jobs back to the region. (PSR ¶ 45.) The Governor's Office empowered Kaloyeros—who was head of the College of Nanoscale Science and Engineering ("CNSE") and ran Fort Schuyler—to propose projects to be funded with State money, and entrusted Kaloyeros to oversee the application processes for those projects. (PSR ¶ 46.)

Kaloyeros could not have reached this position of trust and power without the help of Todd Howe. In or around January 2012, Kaloyeros retained Howe to serve as a consultant to CNSE. (PSR ¶ 47.) Howe's intimacy and influence with the Governor and his senior advisors allowed Howe to alleviate the Governor's Office's suspicions of Kaloyeros, and eventually to position Kaloyeros to lead the Buffalo Billion initiative. (PSR ¶ 47.) Howe's connections allowed Kaloyeros to retain a prominent and lucrative job within the State University of New York ("SUNY")—indeed, Kaloyeros has been widely reported as having been the highest paid State employee in New York. During this same time period, Howe helped Kaloyeros gain the Governor's support for establishing Kaloyeros's own SUNY campus to lead—a position of prestige and importance to Kaloyeros. (PSR ¶ 47.)

Consistent with Fort Schuyler's practices, as well as the practices and policies of SUNY, the SUNY Research Foundation, and the State of New York, and at Kaloyeros's direction, Fort Schuyler issued request for proposals ("RFPs") to create a public competition to select construction partners for the Buffalo Billion projects. (PSR ¶ 48.) Unbeknownst to the individuals at Fort Schuyler charged with administering the competition and selecting a winner, however, Kaloyeros and Howe secretly solicited from Aiello, Gerardi, and Ciminelli qualifications of COR Development and LPCiminelli to put in the RFPs so that the RFPs would request qualifications unique to those companies. (PSR ¶ 51.) In addition, Kaloyeros and Howe provided the pre-selected developers with advance copies of the RFP and solicited their feedback, advantages that were not given to any other development company. (PSR ¶ 52.)

As a result of this scheme, LPCiminelli was named a "Preferred Developer" of CNSE in Buffalo, New York, and ultimately awarded a construction contract worth approximately $750 million. (PSR ¶ 58.) Of that $750 million, LPCiminelli retained a 3.5% management fee, or approximately $26,250,000. (*See* PSR ¶ 65.) COR Development was named a "Preferred Developer" of CNSE in Syracuse, New York, and ultimately awarded construction contracts worth $15 million and $90 million to build a film center and LED light manufacturing plant, respectively. (PSR ¶ 58.) Of that $105 million, COR Development retained an 8% management fee, or approximately $8,400,000. (PSR ¶ 69.)

After FBI agents interviewed competitors LPCiminelli in Buffalo, New York, Kaloyeros deleted every email between himself and Todd Howe then in his account in an effort to hide his conduct. (Tr. 1711-27 (testimony of Justin Ellard).)

### B. Guilty Verdict and Sentencings

On July 12, 2018, a jury returned a verdict of guilty as to all counts against Kaloyeros and his co-defendants, Ciminelli, Aiello, and Gerardi. Specifically, Kaloyeros was convicted of one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and two counts of wire fraud, in violation of 18 U.S.C. § 1343, each of which carries a maximum term of imprisonment of 20 years.

None of Kaloyeros's co-defendants at trial have been sentenced. However, two of Kaloyeros's co-defendants in the S2 Indictment have been sentenced based on separate conduct. Specifically, Joseph Percoco was sentenced by the Court principally to a term of imprisonment of 72 months based on his receipt of bribes from Aiello, Gerardi, and Peter Galbraith Kelly. Kelly was sentenced principally to a term of imprisonment of 14 months for defrauding his employer into hiring Percoco's wife.

## II. APPLICABLE GUIDELINES RANGE

The Government and the Probation Office agree that Ciminelli's total offense level is 33, which, when combined with a Criminal History Category of I, yields a Guidelines sentencing range of 135 to 168 months' imprisonment. (PSR ¶¶ 85, 89, 136.) Specifically, the applicable Guidelines provision, Section 2B1.1, provides for a base offense level of 7 and, as relevant here, an enhancement based on the actual or intended loss from the offense. Because there was an actual or intended loss, but that loss cannot reasonably be determined, the gain to LPCiminelli and to COR Development from the offense—calculated as the fees charged by each company—is used as an alternative measure of loss, resulting in a 22-level enhancement, corresponding to a $34,650,000 gain. *See* U.S.S.G. § 2B1.1(b) & cmt. 3. Additionally, because Kaloyeros abused a position of public trust, a 2-level enhancement applies. Finally, due to Kaloyeros's attempt to obstruct the investigation in this case, an additional 2-level enhancement applies.

Kaloyeros has objected to the calculation of his offense level on the grounds that (1) the Government has not established that a loss occurred; and (2) the Government has not proven that Kaloyeros obstructed justice. (PSR at 33.) As an initial matter, Kaloyeros observes that he "did not financially gain from the alleged scheme at all." (PSR at 33.) This assertion is both irrelevant and wrong. Kaloyeros has pointed to no authority suggesting that his personal gain has any bearing on calculating the loss enhancement. To the contrary, gain to the companies is used here merely as an alternative means of estimating the loss due to the conduct of Kaloyeros and his co-conspirators. U.S.S.G. § 2B1.1 cmt. 3(B). In any case, Kaloyeros *did* gain from his conduct: as part of his agreement with Howe, Howe helped Kaloyeros maintain (and increase) his position and his $1,250,000 salary.

Kaloyeros argues, more substantively, that the Government has not proven any loss. Kaloyeros assumes—incorrectly—that the Government must prove actual loss. In fact, "[l]oss for

purposes of the fraud guideline . . . is defined as 'the greater of actual loss or intended loss.'" *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 103 (2d Cir. 2014) (quoting U.S.S.G. § 2B1.1 cmt. 3(A)). The Guidelines define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense," and "intended loss" as "the pecuniary harm that the defendant purposely sought to inflict," including "intended pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1 cmt. 3(A)(i), (ii).

Here, the Government has proven that there was an intended loss. Indeed, conspiring to rig an RFP to prevent other companies from fairly competing only makes sense if the goal is to ensure that a better or lower price competitor cannot win the bidding, and a notable feature of the bid-rigging scheme here was to prevent evaluation based on price. As Kevin Schuler testified, LPCiminelli did not want to afford an opportunity for another company to compete by offering a lower price (*see* Tr. 1096), and the jury found beyond a reasonable doubt that the defendants exposed Fort Schuyler to a risk of economic harm (Tr. 2885-86). In short, the Government has proven that Kaloyeros and his co-defendants intended pecuniary harm. As such, a loss enhancement applies, which may be measured in terms of gain. *See, e.g.*, *United States v. Thomas*, 101 F.3d 1392, 1996 WL 364553, at *3 (2d Cir. 1996) ("[W]hen loss or intended loss cannot be determined with precision, the Sentencing Guidelines support reasonable alternative estimates of loss, including the use of '[t]he offender's gain from committing the fraud.'" (quoting former fraud provision of the Sentencing Guidelines, Section 2F1.1 cmt. 8)).

Even if Kaloyeros were correct in focusing on actual loss, however, he would still be subject to a loss enhancement. Mark Balling, formerly senior vice president of Lend Lease, a significant construction company in Western New York that was interested in the Buffalo Billion projects, testified that during the relevant time period, Lend Lease's typical fee for construction management at risk was 2% to 2.5% for projects under $100 million in size, and less for larger projects. (Tr. 1512.) Steven Bills, vice president of LeChase Construction Services, another construction company in Western New York interested in the Buffalo Billion projects, similarly testified that LeChase's typical construction management fee ranged from 2% for projects in excess of $200 million to 4-5% for projects in the range of $1 million to $5 million. (Tr. 1613.) By contrast, LPCiminelli charged a 3.5% fee on a $750 million project and COR charged an 8% fee on its $15 million and $90 million projects. Kaloyeros responds to this testimony by noting that "[n]either Mr. Bills nor Mr. Balling testified that the construction management fees charged for these projects were too high." (PSR at 33.) But the question is not whether the fees were "too high," whatever that might mean, but rather whether in a legitimate competition another company would have offered a lower price. The testimony of Bills and Balling clearly establishes that fact beyond a preponderance of the evidence.

Because a loss occurred, an enhancement applies under Section 2B1.1(b). There is, however, no reasonable way to determine the exact loss because the defendants' scheme worked: they forestalled a real competition, making it not reasonably possible to determine the lowest price Fort Schuyler would have obtained absent the fraudulent scheme. Accordingly, gain may be used as an alternative measure of loss, and it is clear in this case that gain provides a reasonable and apt estimate of the loss for the purposes of imposing an appropriate enhancement under the Guidelines. U.S.S.G. § 2B1.1 cmt. 3(B). First, the scope and impact of this fraud was enormous: it went to the

control over and fair use of hundreds of millions of taxpayer dollars, and adversely impacted not only Fort Schuyler's disposition of that money but also the public's faith in the fair and just administration of vast sums of taxpayer dollars and public investment in economic development. *See id.* § 2B1.1 cmt. 3(C)(vi) ("The estimate of loss shall be based on available information, taking into account . . . [m]ore general factors, such as the scope and duration of the offense and revenues generated by similar operations."). Second, where the defendants have defrauded the victim of its right to control its assets, the extent of the assets fraudulently taken control of provides a reasonable estimate of the victim's loss. *See United States v. Williams*, 736 F. App'x 267, 273 (2d Cir. 2018) ("[The defendant's] use of fraudulent means to deprive . . . victims of 'potentially valuable economic information' that might otherwise have led them not to pay off those debts, *Binday*, 804 F.3d at 570 (internal quotation marks omitted), rendered each payment part of the harm he inflicted by depriving the victims of the right to control their finances, and therefore a reasonable estimate of the victims' loss.").

Kaloyeros also objects to the obstruction-of-justice enhancement, on the basis that "there is insufficient evidence to support that Kaloyeros deleted his emails in order to obstruct the Government's investigation into the RFP processes at issue in this case." (PSR at 33.) The evidence on this topic at trial was clear, and cannot be in serious dispute. After FBI agents began interviewing competitors to LPCiminelli in Buffalo, Kaloyeros selectively stripped his Gmail account of every communication with Todd Howe. These facts alone establish far beyond a preponderance of the evidence that Kaloyeros intended to prevent the Government from uncovering evidence of his corrupt relationship with Howe and his rigging of the RFPs.

## III. DISCUSSION

As the Court is aware, the Sentencing Guidelines provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, however, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct, protect the public from further crimes of the defendant, and promote respect for the law. *Id.* at 50 & n.6.

The Government submits, consistent with the Probation Office's recommendation, that a substantial prison sentence, though one below the applicable Guidelines range, would be sufficient but not greater than necessary to comply with the purposes of sentencing in this case.

### A. The Nature, Circumstances, and Seriousness of the Offense

The conduct at issue here was far-reaching and affected key institutions relied on by the citizens of New York. Although the board members and employees of Fort Schuyler were

cynically deceived by the defendants in an effort to take control over enormous amounts of taxpayer dollars, the victims in this case are far broader. Kaloyeros and his co-defendants deprived honest competitors of the efforts and expense that those competitors spent on what was in truth a hopeless attempt to obtain State business, and, perhaps more importantly, took from those competitors a fair chance to compete for a share of the work and earnings funded by the citizens of New York. Kaloyeros and his co-defendants also took from the citizens of New York their right and expectation to see that their money would be used to develop and benefit their State, and not as a tool to benefit wealthy businessmen who paid lobbyists with unethical access and influence in State government and who made large contributions to the Governor's election efforts.

Furthermore, Kaloyeros abused a position of great power and public trust, and did so in order to curry favor with a lobbyist and with the Governor of New York—all in an effort to guarantee his position of prestige and authority (not to mention the largest salary of a public employee in the State of New York). Indeed, the scheme was substantially driven by Kaloyeros himself—it was Kaloyeros who came up with the plan to tailor the RFPs and RFP process, and it was Kaloyeros who sat at his computer and drafted the fraudulent language in the RFPs. That Kaloyeros—a professor and University leader vested with an unusual degree of public trust in administering enormous sums of public development money—would callously cast aside his duties and responsibilities to his institution and to the taxpayers in favor of his own self-interest demonstrates a remarkable breach of the public trust.

Moreover, Kaloyeros's conduct went beyond his participation in a scheme to defraud. When faced with the real possibility of criminal liability, Kaloyeros's response was to attempt to erase the evidence of his crime to obstruct the investigation and elude responsibility. And Kaloyeros's email deletions were not an isolated incident—Kaloyeros, despite running a public university subject to FOIL—went to enormous lengths to hide his conduct. Kaloyeros used his personal Gmail account to communicate with Todd Howe (despite their purportedly legal lobbying arrangement) regarding their fraud, alternating calculatingly between his Gmail account with Howe to tailor the RFPs and his government account with those unaware of and victimized by the fraud. Kaloyeros then went to the unusual lengths of ensuring that backups of his work emails were deleted. (*See* Tr. 119-33 (testimony of Andrew Bellinger); GX 140, 141, 142.) When facing scrutiny about his management of the RFP processes, Kaloyeros turned to outright lies to the press, falsely claiming that Fort Schuyler followed all New York State procurement rules and obscuring his relationship with Howe. (*See* Tr. 1834-44, 1856-59 (testimony of David Doyle); GX 144R, 145, 1044R.) And not content to lie and deceive the public himself, Kaloyeros then began using WICKR—an application that ensures that communications are deleted and unrecoverable— with Howe, and instructed at least one employee to do the same. (*See* Tr. 1860-63 (testimony of David Doyle).) In short, Kaloyeros's efforts to delete his criminal communications represents additional criminal conduct requiring appropriate punishment.

The defendant's conduct, and its impact on direct and indirect victims mandates a substantial term of imprisonment.

### B. The Need to Deter Criminal Conduct

Kaloyeros's offense represents fraudulent, corrupt, and unethical conduct at some of the highest reaches of State government often not visible to citizens. Indeed, Kaloyeros, despite his enormous power and control over State money, was not answerable to citizens of New York. As the Court stated in sentencing Joseph Percoco, "I hope that this sentence will be heard in Albany." It is critical that the Court send a message to those individuals entrusted with the power and purse strings of the State that they cannot use that authority to benefit themselves and their criminal partners with impunity.

### C. The Need to Avoid Unwarranted Sentence Disparities Among Defendants

Kaloyeros was convicted at trial with three other individuals for their roles in defrauding Fort Schuyler. The Government views Kaloyeros as the most culpable of the four. Kaloyeros was a State employee granted enormous discretion and trust by the Governor of New York. The evidence at trial also shows that Kaloyeros was more proactive than his co-defendants in perpetrating the fraud, as he was the individual drafting the RFPs and working to insert qualifications that would steer the awards to his co-conspirators. Although Ciminelli, Aiello, and Gerardi, reaped largely pecuniary benefits, Kaloyeros was able to get what he wanted out of the arrangement—his place of prominence (and wealth) in the State.

## IV. CONCLUSION

For the foregoing reasons, the Government respectfully submits that the defendant should be sentenced to a below-Guidelines-range but substantial term of imprisonment.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: /s/
Matthew Podolsky
David Zhou
Robert Boone
Janis Echenberg
Assistant United States Attorneys
(212) 637-1947/2438/2208/2597

cc: Counsel for Alain Kaloyeros (by ECF)